210 F.Supp.2d 1331 (2002)
In re INFOCURE SECURITIES LITIGATION.
Joseph V. Hafner, Plaintiff,
v.
Infocure Corporation, a Delaware General Corporation, et al., Defendants.
Hans Habermeier, M.D., Plaintiff,
v.
Infocure Corporation, a Delaware General Corporation, et al., Defendants.
Joseph Memminger, Plaintiff,
v.
Infocure Corporation, a Delaware General Corporation, et al., Defendants.
Robert Runde, Plaintiff,
v.
Infocure Corporation, a Delaware General Corporation, et al., Defendants.
Richard Weintraub, M.D., Plaintiff,
v.
Infocure Corporation, a Delaware General Corporation, et al., Defendants.
Gary Weiner, et al., Plaintiffs,
v.
Infocure Corporation and Morris, Manning & Martin, LLP, Defendants.
Civil Action Nos. 1:00-CV-3123-TWT, 1:00-CV-3442-TWT, 1:00-CV-3247-TWT, 1:00-CV-3441-TWT, 1:00-CV-3440-TWT, 1:00-CV-0001-TWT, 1:01-CV-840-TWT.
United States District Court, N.D. Georgia, Atlanta Division.
July 17, 2002.
*1332 *1333 *1334 *1335 C. Michael Evert, Jr., Evert & Weathersby, Atlanta, GA, David F. Conn, phv, Frank & Rosen, Philadelphia, PA, Alan L. Frank, phv, Frank & Rosen, Philadelphia, PA, for plaintiffs.
Michael R. Smith, David Lawrence Green, Andrea Ortbals Patton, King & Spalding, David N. Schaeffer, Woodrow W. Vaughn, Jr., Kidd & Vaughn, Henry Lane Young, II, Christine L. Mast, Emory L. Palmer, Hawkins & Parnell, Atlanta, GA, Pollack & Kaminsky by Martin I. Kaminsky and Edward T. McDermott, New York City, for defendants.

ORDER
THRASH, District Judge.
These are six related actions for breach of contract and securities fraud. They were consolidated for discovery but not for trial. The actions arise out of a series of transactions in 1999 in which the Defendant Infocure acquired companies owned by Plaintiffs in exchange for Infocure stock. The Plaintiffs suffered large losses when the Infocure stock price collapsed in early 2000. After settling with Infocure, Plaintiffs seek to recover damages from the law firm that represented Infocure in the acquisitions. The Plaintiffs move for partial summary judgment on their securities fraud claims. The Defendant Morris, Manning & Martin moves for summary judgment as to all claims. In my opinion, the securities fraud claims against Morris, Manning & Martin are barred by recent Supreme Court and Eleventh Circuit precedent restricting the liability of law firms participating in securities transactions, and the breach of contract claims fail due to the absence of an attorney client relationship. Therefore, I am granting the Defendant's motions and denying the Plaintiffs' motion. In the complicated securities transactions involved in these cases, culpability on the part of the client does not translate into liability on the part of the attorneys.

I. BACKGROUND
These actions arise out of four transactions whereby Infocure Corporation acquired the companies previously owned by the Plaintiffs. In the four transactions at issue, the owners of the acquired companies received stock in Infocure in exchange for relinquishing their ownership of the companies. Infocure, a publicly traded corporation headquartered in Atlanta, was a leading national provider of information technology and services targeted to healthcare providers. The transactions at issue made the Plaintiffs "purchasers" of Infocure stock, giving rise to obligations under the federal and state securities laws.

A. THE FOUR TRANSACTIONS

1. HAFNER/GLENTEC
Plaintiff Joseph Hafner was the President and sole shareholder of Ardsley M.I.S., Inc., d/b/a Glentec Business Computers, Inc. ("Glentec"). Glentec was a Pennsylvania corporation in the business of developing, marketing and supporting a product known as "orthoware." This product is a PC-based practice management software package for orthodontic professionals. On July 3, 1999, a Letter of Intent was executed between Richard Perlman, Chairman of Infocure, and Hafner, by which Infocure agreed to purchase all of Hafner's interest in GlenTec for a number of unregistered shares of Infocure Common Stock. (Pla.'s Motion, Ex. G, Letter from Infocure Corp. to Hafner of 7/2/99.)[1] Hafner and Infocure anticipated *1336 registration of the shares after the closing of the transaction. On August 18, 1999, during the closing of the GlenTec transaction in Atlanta, it was specifically negotiated between Hafner and Infocure that Hafner's Registration Rights Agreement ("RRA")would contain the following language:
The Company [Infocure] will file with the SEC a registration under the Securities Act on Form S-3 covering the Registrable Securities, on or before October 31, 1999, at its expense.
(Pla.'s Motion, Ex. R, Registration Rights Agreement § 2 at 2.) Until the shares were subject to an effective registration statement with the SEC, they were not tradeable on national securities markets. GlenTec and Plaintiff Hafner were represented in this transaction by the Philadelphia law firm of Frank & Rosen. Defendant Morris, Manning & Martin ("MM & M") represented Infocure during the course of the transaction. Richard Haury led the team from MM & M, accompanied by associates Bradley Pruitt and Duncan Spears.
A few days prior to the closing, Infocure declared a two-for-one stock split. In mid-August, 1999, Plaintiff Hafner received stock certificates totaling the post-split amount of 209,016 shares. Because the stock was unregistered, these certificates contained a legend restricting the marketability of the shares. On or about September 17, 1999, Duncan Spears of MM & M sent a "Notice of Intent to File Registration Statement" to Plaintiff Hafner in Pennsylvania. This First Notice, by its terms, offered Hafner the opportunity to register all 209,016 shares of his unregistered Infocure stock. Hafner consulted with Duncan Spears on several occasions as to the proper manner in which to complete the application in the First Notice. Spears advised and instructed Hafner as to the appropriate completion of the application, with which Hafner complied. Plaintiff Hafner timely completed and returned the First Notice to MM & M, care of Spears, requesting registration of all 209,016 shares of his Infocure stock. On this date, the share price closed at $21.56 on the NASDAQ market (reflecting the two-for-one split). Despite Plaintiff Haffner's request to register all of his stock, MM & M failed to register half of the total amount. Upon realizing that only 104,508 of his shares had been registered, Plaintiff Hafner immediately contacted Spears to inquire as to the registration of the remainder of the stock. Spears indicated he would investigate the matter.
Because of Plaintiff Hafner's need for liquidity, he sold 94,057 shares of his registered stock on the NASDAQ following the publication of Infocure's Third Quarter 1999 financials. The sale was accomplished in small blocks over a four day period from November 16 to 19, 1999, at between $17.00 and $20.00 per share. The October 31, 1999, deadline for the registration of Hafner's remaining stock came and went without full registration. Plaintiff Hafner alleges that MM & M filed another, unrelated registration statement in mid-October on behalf of Infocure, but which did not contain his shares. Both Infocure and the attorneys at MM & M responded to Hafner's inquiries by telling him that a registration statement would be filed shortly, and that it was delayed because of accounting difficulties at Infocure. MM & M sent Hafner a subsequent "Notice of Intent to File Registration Statement" on or about November 11, 1999. Plaintiff Hafner again promptly completed and returned the second notice to Spears, requesting the registration of his remaining unregistered shares. Despite this second request, it is undisputed that no S-3 *1337 or registration statement which included his shares was filed in November, 1999. No registration statement for Hafner's unregistered shares was filed until April, 2000. By then the price for Infocure stock had fallen to $6.00 per share. Plaintiff Hafner asserts no securities claims. His only claim is for breach of contract. Jurisdiction is based upon diversity of citizenship.

2. MEDFAX
Plaintiffs Habermeier, Runde, and Weintraub were shareholders of Medfax Corporation, a South Carolina corporation in the business of providing computer hardware and software to healthcare providers in the field of radiology. As part of its acquisition strategy, Infocure also approached Medfax Corporation in the late Spring of 1999. On August 2, 1999, a Letter of Intent was executed between Perlman, of Infocure, and Runde for the Medfax Plaintiffs, by which Infocure agreed to purchase Medfax in exchange for unregistered Infocure stock. The Letter of Intent for the Medfax Plaintiffs called for registration of their stock by Infocure in three equal blocks, on September, 10, 1999; December 10, 1999; and February 10, 2000. (Pla.'s Motion, Ex. H, Letter from Infocure Corp. to Runde, Habermeier and Weintraub of 8/2/99.)
Consistent with this understanding, and in conjunction with the Medfax closing, Infocure and the Medfax Plaintiffs entered into a Registration Rights Agreement stating that:
The Company will file, at its expense, with the SEC a registration statement (which may be on Form S-3 if the Company is eligible to use such forms) covering one-third (1/3) of the Registrable Securities on September 7, 1999 (the "First Registration"). The Company shall use its best efforts to cause the First Registration to be effective by the SEC at the earliest date possible following September 7, 1999. The Company will file, at its expense with the SEC under the Securities Act, a second registration statement (which may be on Form S-3 if the Company is eligible to use such form) covering one-third (1/3) of the Registrable Securities on December 10, 1999 (the "Second Registration"). The Company shall use its best efforts to cause the Second Registration to be declared effective by the SEC on December 21, 1999. The Company will file, at its expense with the SEC a third registration statement (which may be on Form S-3 if the Company is eligible to use such form) covering the remaining one-third (1/3) of the Registrable Securities on or before February 10, 2000 (the "Third Registration"). The Company shall use its best efforts to cause the Third Registration to be declared effective by the SEC on February 21, 2000.
(Pla.'s Motion, Ex. S, Registration Rights Agreement, § 2 at 2.) In connection with the closing of the transaction, MM & M gave MedFax an opinion letter which will be discussed in detail below. On August 30, 1999, MedFax and Infocure consummated the merger by means of a pooling-of-interests merger.
On or about September 8, 1999, stock certificates for 235,089 shares of Infocure Common Stock were delivered to Habermeier, 280,412 shares to Runde, and 149,675 shares to Weintraub. These certificates contained legends restricting the marketability of the shares as unregistered securities. A registration statement for approximately one third of the shares, which were consideration for the merger transaction, was filed by Infocure on behalf of Plaintiffs and other shareholders on September 24, 1999. Infocure filed another, unrelated, registration statement in mid-October, 1999, with the SEC which did not include any of Plaintiffs' remaining shares. Plaintiffs did not receive notice of *1338 Infocure's intent to file another Form S-3 with the SEC in October, 1999. December, 1999 came and went without Infocure filing a registration statement as it had agreed to do in the Registration Rights Agreement for the second block of Plaintiffs' shares. Through January of 2000, the price of Infocure stock rose sharply. On January 24, 2000, Infocure stock closed at its all-time high of $36.625 per share. During conversations in January and February of 2000, between Plaintiff Robert Runde and representatives of Infocure, Runde was informed that Infocure had, without notice to Runde or the other Plaintiffs, intentionally delayed the December 10, 1999, registration of Plaintiffs' shares because Infocure had suspended all sales of stock under its current SEC filings. No registration statement was filed for Plaintiffs' stock in February, 2000. The MedFax Plaintiffs were represented in the transaction by the North Carolina law firm of Robinson Bradshaw & Hinson. Defendant MM & M represented Infocure. The Medfax Plaintiffs bring securities fraud claims in addition to breach of contract claims under state law.

3. MEMMINGER/SDM
Plaintiff Memminger was the President and principal shareholder of Scientific Data Management, Inc. ("SDM"), a Michigan corporation founded in 1982. SDM was in the business of developing, marketing and supporting computer software for the management of medical offices. On June 27, 1999, Infocure and Memminger signed a Letter of Intent by which Infocure agreed to purchase all of Memminger's interest in SDM for unregistered shares of Infocure stock. (Pla.'s Motion, Ex. F, Letter from Infocure Corp. to Memminger of 6/27/99.) The Memminger Letter of Intent called for registration of all of Memminger's Infocure stock "upon demand" by Memminger following the publication of 30 days' combined financial statements, and stated that Infocure anticipated that all of Memminger's stock would be available for sale by September or October of 1999. (Pla.'s Motion, Ex. F, Letter from Infocure Corp. to Memminger of 6/27/99, ¶ 2 at 1-2.)
In another pooling-of-interests transaction, SDM merged with Infocure on August 31, 1999. This transaction involved a simultaneous contract execution and closing. In conjunction with that closing, Infocure and Memminger signed a Registration Rights Agreement which provided as follows:
At any time following the date on which the requirements of SEC Accounting Series Release Nos. 130 and 135 have been met, the Company will file with SEC a registration under the Securities Act on Form S-3 covering the Registrable Securities at its expense. The Company shall use its best efforts to effect such registration of the Registrable Securities at the earliest date possible after filing with the SEC; provided, however, that if the Company has filed with the SEC a registration statement for an underwritten public offering of Common Stock which has not been declared effective by the SEC as of the date of filing such registration statement pursuant to this Section 2, the Company shall not be required to cause the registration on Form S-3 pursuant to this Section to be declared effective until the underwritten registration statement has been declared effective by the SEC.
(Pla.'s Motion, Ex. U, Registration Rights Agreement, § 2 at 2.) Furthermore, Memminger's Registration Rights Agreement goes on, at Section 4, titled "Obligations of the Company", to state as follows:
Whenever the Company is required by the provisions of the [RRA] to use its best efforts to effect the registration of [Memminger's stock, Infocure] shall:

*1339 A. Prepare, and as soon as possible, file with the SEC a registration statement with respect to the Registrable Securities ...
(Pla.'s Motion, Ex. U, Registration Rights Agreement, § 4.) Memminger's RRA defines the term "Registrable Securities" as all of Memminger's unregistered Infocure stock. (Pla.'s Motion, Ex. U, RRA at 1). SDM and Plaintiff Memminger were represented in the merger by the Detroit firm of Berry Moorman, P.C., led by attorney Robert Hudson. MM & M again served as Infocure's attorney. Plaintiff Memminger, together with the Medfax Plaintiffs, are referred to as the August Plaintiffs. Plaintiff Memminger asserts securities fraud and breach of contract claims.

4. CDL
Plaintiffs Gary Weiner, William Dacamara, Richard Souviron, and Joel Schram, were each shareholders of CDL Healthcare Systems, Inc. ("CDL"), a Florida corporation which was in the business of providing computer hardware and practice management software to healthcare providers. Infocure agreed to acquire the stock of CDL in exchange for a total of 109,658 shares of Infocure common stock, valued at approximately $22.08 per share. As consideration for their CDL stock, Plaintiffs Souviron and Weiner each received 31,709 shares of Infocure stock. Dacamara received 19,592 shares. Schram received 4,465 shares personally, and his pension plan received 1,311 shares. The closing of this transaction occurred on December 30,1999. The actual stock closing price of Infocure stock on the NASDAQ market on that day was $31.00 per share. Plaintiffs Weiner, Schram, Dacamara and Souviron have brought a joint action asserting securities law and state law fraud claims, but no breach of contract claims. The CDL Plaintiffs were represented by the Miami law firm of Akerman, Senterfitt & Eidson L.L.P., acting principally through partner Teddy Klinghoffer and associate Andrea Fisher. As in the other transactions, Infocure was represented by MM & M.
On December 30, 1999, the CDL Plaintiffs executed their closing documents, and faxed them to MM & M to complete the closing of the merger between CDL and Infocure. During the closing, it was determined that Infocure would acquire the stock of CDL in exchange for a total of 109,658 shares of Infocure common stock, which on that day closed at $31.00 per share. The CDL Plaintiffs, collectively, received 88,800 shares, with the rest being distributed to the minority shareholders of CDL, who are not parties to this action. Infocure specifically represented in the Agreement and Plan of Merger executed in connection with the CDL transaction that:
Since November 30, 1999, there has not been any material adverse change in the business, operations, properties, assets, or financial condition of [Infocure], and no event has occurred and, to [Infocure's] knowledge, no circumstance exists that is likely to result in a material adverse change other than with respect to general domestic or international economic conditions.
(Pla.'s Motion, Ex. SSS, CDL Agreement and Plan of Merger at 14.) As a condition precedent to the consummation of the merger, MM & M, as counsel to Infocure, gave an Opinion Letter to CDL. The Opinion Letter states at Paragraph 5 that:
5. The execution and delivery by [Infocure] of the Acquisition Documents to which it is a party do not, and if [Infocure] were to perform [its] obligations under the Acquisition Documents such performance would not, result in any:

*1340 * * *
(ii) Violation of any existing federal or state constitution, statute, regulation, rule, order, or law to which [Infocure] or [its] respective assets are subject.
(Pla.'s Motion, Ex. TTT, Letter from MM & M to CDL Healthcare Systems, Inc. of 12/30/99 [hereinafter "Opinion Letter"].)
In support of the Opinion Letter, Fine, Price and Perlman each signed and executed Officer's Certificates to MM & M on behalf of Infocure. The Officer's Certificates state, at Paragraph 12, as follows:
12. Nothing has come to our attention that has caused us to believe that the representations, warranties and covenants in the Agreement, as of the Closing Date and as of the date hereof, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.
(Pla.'s Motion, Ex. UUU, CDL Infocure Officer's Certificate.) The CDL Plaintiffs assert that MM & M and Infocure knew, at some time well prior to December 30, 1999, that Infocure had failed to timely register (i) 104,508 of Joseph Hafner's shares, (ii) 140,122 of Joseph Memminger's shares, and (iii) 232,111 of the Medfax shareholders' shares. This was a total of 476,741 shares which were left unregistered in violation of the August Plaintiffs' Registration Rights Agreements. On December 30, 1999, Infocure's closing price was $31.00 per share, which meant that these unregistered shares would have had a value of over $14 Million on that date, had the shares been registered and available for sale.
On November 10, 1999, according to MM & M's December 16, 1999 bill for services rendered to Infocure, Brewer of MM & M reviewed "the registration rights of all related parties in order to create a form of registration rights follow-on check-list" for Infocure. Follow-up time entries indicate that MM & M was by this time aware of at least Hafner's missed October 31, 1999 deadline and the attendant breach of Hafner's Registration Rights Agreement. (Pla.'s Motion, Ex. II, Bill no. 162408 from MM & M to Infocure of 12/16/99.) Meanwhile, only one-half of Memminger's shares were registered on October 7, 1999, and the registration deadline for the Medfax Plaintiffs' second block of shares, December 10, 1999, had come and gone without the registration of that block of shares.
In addition, on December 30, 1999, Infocure and MM & M each also knew that Infocure had yet to publish the retroactively restated audited financial statements which were mandated by Regulation S-X as a result of the acquisition by Infocure of Datamedic on November 9, 1999, thus precluding them from filing an S-3 Registration Statement for the August Plaintiffs' shares. Further, according to Cochran, Infocure's Rule 30(b)(6) designee, Infocure knew that, as a result of its rapid pace of acquisitions in late 1999, its change in business model, and other year-end accounting issues, Infocure did not have the manpower resources available to undertake the necessary filing of the audited restated financials, and that they probably would not be filed until they were included in the 1999 Form 10-K. (Pla.'s Motion, Ex. K, Cochran Dep. at 63-67.) That 10-K was not filed until March 30, 2000. Therefore, according to Plaintiffs, Infocure and MM & M each knew, as of December 30, 1999, that the last third of the Medfax shareholders' shares was not reasonably likely to be registered by the February 10, 2000 deadline. These additional unregistered Medfax shares had a value of approximately $7,285,000 at $31.00 per share, as of December 30, 1999.
*1341 Also on December 30, 1999, Plaintiffs assert that Infocure and MM & M each knew that trading under the outstanding shelf registration statements had been suspended without notice to any shareholder from December 20 until December 23, 1999, in violation of the Registration Rights Agreements of the August Plaintiffs. They also were aware of the significant possibility of further suspensions in the not-too-distant future, because of several events identified by Infocure's corporate designee. These events included the adoption of a new business strategy, merger discussions with Per-Se Technologies in late October, 1999, and merger discussions with WebMD in late 1999, and more seriously in January of 2000. Cochran, the corporate designee, testified that these events rose to the level of materiality which would have required the corporation to suspend trading under the outstanding shelf registration statements. (Pla.'s Motion, Ex. VVV, Cochran Dep. at 113-115.) Lauren Burnham, a securities lawyer at MM & M who handled significant Infocure matters including the suspension of trading under shelf registration statements, concurred in this assessment. (Pla.'s Motion, Ex. WWW, Burnham Dep. at 417-18.) In fact, Infocure did, once again, suspend trading under the outstanding prospectuses between January 16, 2000, and February 24, 2000, again halting, without any notice, the ability of the August Plaintiffs to trade in their unsold but registered shares during that time period. Plaintiffs assert that this amounted to the unlawful withholding from the market of approximately another 350,000 shares of stock belonging to the August Plaintiffs, which, as of December 30, 1999, at $31.00 per share, had a market value of almost $11,000,000.00. Plaintiffs' theory posits that these events constitute breaches of the August Plaintiffs' Registration Rights Agreements and the potential damages flowing therefrom, were clearly material as a matter of law to Infocure and the CDL Plaintiffs as of December 30, 1999.
Neither Infocure nor MM & M revealed the facts and circumstances giving rise to these potential claims against the company. The Opinion Letter and Officer's Certificates specifically represented to the CDL Plaintiffs in their Agreement and Plan of Merger that no material litigation was threatened or pending, and that management knew of no circumstances then-existing which could give rise to material litigation:
4.6 Litigation. Except as may be disclosed in the Infocure SEC Reports, there are no suits, arbitrations, actions, claims, complaints, grievances, investigations or proceedings pending or, to the Knowledge of Infocure ... Threatened against Infocure ... that, if resolved against Infocure ... could be reasonably expected to have a Material Adverse Effect [on Infocure] or a material adverse effect on their ability to consummate the Merger and the other transactions contemplated hereby.
Section 4.7 of the Agreement reads as follows:
4.7 Disclosure. No representation, warranty or covenant made by Infocure ... in this Agreement or any Exhibit hereto contains any untrue statement of a material fact or omits to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not misleading.
(Pla.'s Motion, Ex. SSS, CDL Agreement and Plan of Merger at 36.) Additionally, MM & M issued an Opinion Letter, signed by Richard Haury, which stated as follows:
[W]e confirm to you that to our knowledge, except as to disclosed in the Parent SEC Reports, no litigation or other proceeding against [Infocure] or any of [Infocure's] assets which would have a *1342 material adverse effect on the operation of the businesses of [Infocure] is pending or overtly threatened by a written communication to [Infocure].
(Pla.'s Motion, Ex. TTT, CDL MM & M Opinion Letter at 4.) Infocure closed on the CDL Plaintiffs' transaction, acquiring their business for Infocure common stock. According to Plaintiffs, Infocure disclosed none of the risks of their business model change nor any of the factors leading to Infocure's substantial economic downturn (discussed in detail below), and furthermore remained wholly silent as to the potential claims of the August Plaintiffs.

B. BUSINESS EVENTS AT INFOCURE

1. GOLDMAN, SACHS RETENTION
On July 14, 1999, Infocure retained the investment banking firm of Goldman, Sachs in connection with possible strategic alternatives that might be available for Infocure, including a possible sale of Infocure to another company. (Pla.'s Motion, Ex. L, Letter from Goldman, Sachs & Co. to Perlman of Infocure of 7/14/99.) The Atlanta law firm of King and Spalding (K & S) represented Infocure in connection with its dealings with Goldman Sachs. K & S attorneys met with the Board of Directors of Infocure on July 23, 1999, to inform the Board as to their responsibilities under applicable securities laws to disclose material non-public corporate information to investors. (Pla.'s Motion, Ex. MMM, Memo from K & S to Infocure Corp. of 7/23/99.) K & S informed the Directors in a written memorandum that, under Basic v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), Infocure was required to disclose material, non-public corporate information to owners of target companies in upcoming acquisitions. (Pla.'s Motion, Ex. MMM, Memo from K & S to Infocure Corp. of 7/23/99.) A disclosure of Goldman, Sachs' retention was made to Plaintiff Hafner during the acquisition of GlenTec Corporation. Infocure, however, did not disclose the existence of the Goldman, Sachs retention to any of the other Plaintiffs. Infocure's securities lawyers, MM & M, made no such disclosure either. Plaintiffs assert that Infocure and MM & M made an affirmative decision not to disclose the retention to the other Plaintiffs.

2. DATAMEDIC ACQUISITION
Throughout most of 1999, Infocure was engaged in merger discussions with a corporation known as Datamedic. Datamedic marketed healthcare practice management software, and had revenues in excess of $20 million. (Pla.'s Motion, Ex. NNN, S-4 Datamedic Form of 9/27/99.) After lengthy negotiations a merger agreement was announced in September, 1999. The Datamedic transaction closed on November 9, 1999. (Pla.'s Motion, Ex. K, Cochran Dep. at 69.) The Datamedic S-4, filed on September 27, 1999, contains a detailed time-line of that transaction. (Pla.'s Motion, Ex. NNN, S-4 at 41-42.) Plaintiffs assert that all of the dates for the Datamedic transaction coincide with significant dates in the acquisitions involving the August Plaintiffs. For example, the Datamedic Final Letter of Intent, defining the price terms of the acquisition and other terms of the deal, was signed by all of the parties to that transaction on July 16, 1999. (Pla.'s Motion, Ex. J, Letter from Infocure Corp. to Christopher, Datamedic Corp. of 7/16/99.) On August 17, 1999, just one day prior to the Hafner closing, Lauren Burnham, a senior securities attorney with MM & M, made a time-sheet entry noting that she had a conference to "discuss disclosure issues related to proposed acquisition and filing S-3 resale registration statement and S-4 for initial issuance of shares in connection with the Datamedic acquisition." (Pla.'s Motion, Ex. P, Bill *1343 No. 156527 from MM & M to Infocure Corp. of 9/9/99.) The Datamedic Board of Directors met with representatives of Infocure on August 25, 1999. On August 26, 1999, Infocure principals met with Datamedic principals at Datamedic's offices in Boston, "to discuss the timing of the transaction and further negotiate terms and conditions of the transaction." (Pla.'s Motion, Ex. NNN, S-4 at 42.) Richard Haury, the transactional partner at MM & M who was handling the deal, traveled to Boston to "finalize agreements" on August 26-27, 1999. (Pla.'s Motion, Ex. KK, Bill No. 156638 from MM & M to Infocure Corp. of 9/9/99.) The Datamedic transaction was approved by Datamedic's Board of Directors on August 31, 1999, the same day as Memminger's closing and only one day after the Medfax Plaintiffs' transaction.
Plaintiffs argue that Infocure, its attorneys, and accountants, all viewed the acquisition of Datamedic as the acquisition of a "significant subsidiary" by Infocure, under the terms of Regulation S-X, 17 C.F.R. § 210.01, et seq., in that the revenues of Datamedic represented more than ten percent (10%) of the combined revenues of the post-closing entity. Under Regulation S-X, the acquisition of a "significant subsidiary" by a publicly traded company such as Infocure requires a retroactive restatement of audited financial statements for the preceding three years. 17 C.F.R. § 210.01 et seq. Until the company's financial statements have been retroactively restated on an audited basis for the applicable time periods as required by that regulation, the company's financial statements fail to contain material disclosures. Until compliance with Regulation S-X has occurred, no Form S-3's may be filed with the SEC to register shares, because a registration statement on Form S-3, and the Prospectus accompanying that registration statement, must incorporate by reference as an exhibit the company's current financial statements.
Plaintiffs argue that Infocure and MM & M knew, or should have known, at least by August 30, 1999, that if Infocure closed on the Datamedic transaction during the Fall of 1999, this would trigger substantial additional restatement of financial statements to satisfy Regulation S-X before any additional Form S-3's could be filed. Two separate accounting firms would have to consent to Infocure's use for SEC filing purposes of the audited, consolidated financial statements required for three years pursuant to Regulation S-X. 17 C.F.R. § 210.01 et seq. Audited, restated and retroactive financial statements were not issued by Infocure until March 30, 2000, when Infocure filed its 1999 Annual Report on Form 10-K with the SEC. (Pla.'s Motion, Ex. XXX, 1999 10-K.)
According to the Medfax Plaintiffs' Registration Rights Agreement, the date of the registration of the first block of stock for the Medfax Plaintiffs was September 7, 1999. However, on September 7, 1999, a letter was sent to the Medfax Plaintiffs regarding Infocure's accountants' unwillingness to consent to the filing of an S-3 for the Medfax Plaintiffs' shares, due to the need to restate the financials for the Medfax pooling-of-interests transaction. Only Medfax was mentioned in the letter. Infocure requested a waiver of the September 7, 1999, filing date until September 24, 1999. The Medfax Plaintiffs agreed to the extension, and signed the letter.
No mention was made in this letter of the existence of the Datamedic transaction; nor was any mention made of the need to restate the financials to include the effect of the anticipated merger with Datamedic. The merger with Datamedic had not been consummated at this time. The time records of MM & M for August-September, 1999, however, reflect that *1344 many hours of attorney time were billed to Infocure for meetings with Infocure's accountants for the purpose of restating Infocure's financial statements to reflect the effect of the Datamedic acquisition. (Pla.'s Motion, Ex. Y, Bill no. 159559 from MM & M to Infocure Corp. of 10/25/99.) The Datamedic transaction was announced to the public by a Form 8-K filed with the SEC on September 24, 1999, the same day that Infocure filed the Form S-3 registering shares of stock belonging to Hafner and the Medfax Plaintiffs. (Pla's Motion Ex. X, Infocure's 8-K of 9/24/99; Ex. BB, Infocure's S-3 of 9/24/99.) Three days later, on September 27, 1999, Infocure filed with the SEC a registration statement on Form S-4 for the Datamedic transaction.
Plaintiffs assert that at the time of the August closings, MM & M attorneys, Brewer, Haury and Pruitt were significantly involved in the Datamedic transaction. (Pla.'s Motion, Ex. OOO, Brewer Dep. at 62-63; Ex. PPP, Haury Dep. at 45-46.) They point out that MM & M attorneys, including partners Haury and Brewer, were logging hundreds of hours in billable time on the Datamedic transaction in August, 1999. (Pla.'s Motion, Ex. PPP, Haury Dep. at 45-46.) Mr. Brewer, a securities attorney by training, has testified that he was the supervising partner on the Infocure files for MM & M with regard to securities matters. (Pla.'s Motion, Ex. OOO, Brewer Dep. at 10-11.) He also participated in significant meetings and undertook legal analysis with regard to issues of the disclosure of material information by Infocure to various acquisition targets. On August 18, 1999, the time sheet entry of Oby Brewer, Esq., a senior partner at MM & M, contained the following item:
4.4 [Hours] Extended discussion with the parties regarding issues involving the potential disclosure of Goldman, Sachs relationship in pending acquisitions; extended research regarding the disclosure strategies of various companies in connection with the retention of investment bankers and proposed sale of business; follow-on extended discussion with members of management and counsel regarding various issues; preparation of a memo to file regarding conclusions.
(Pla.'s Motion, Ex. Q, Bill no. 156524 from MM & M to Infocure Corp. of 9/9/99).
Haury, the MM & M partner who executed all of the opinion letters issued by MM & M in connection with all of the Plaintiffs' closings, spent significant hours in August on the Datamedic transaction, both in Georgia and in Massachusetts. On August 26 and 27, 1999, (three days prior to the Medfax closing, and four days prior to the Memminger closing) Haury was in Datamedic's hometown of Boston, Massachusetts, and made the following time entries in connection with the Datamedic transaction.

8.26.99 R. Haury 14.0 Preparation for and travel to
 Boston, Massachusetts to negotiate
 the final changes to the
 Agreement and Plan of Merger
 and related documents.
8.27.99 R. Haury 13.0 Finalizing Agreement and
 Plan of Merger and related documents
 in Boston Massachusetts;
 return trip to Atlanta, Georgia.

(Pla.'s Motion, Ex. KK, Bill no. 156638 from MM & M to Infocure Corp. of 9/9/99). Plaintiffs allege that as a direct result of the closing of the Datamedic transaction, no shares of Plaintiffs' stock from any of the August transactions in fact were registered during the time period beginning November 9, 1999, and ending when Infocure filed its 1999 Audited Financial Statement on Form 10-K on March 30, 2000. (Pla.'s Motion, Ex. K, Cochran Dep. at 63, 233.) At a minimum, Plaintiffs assert, Infocure and MM & M knew that these undisclosed and material events substantially increased the risk that Infocure would be unable to meet the registration *1345 obligations it owed to the August Plaintiffs. The August Plaintiffs accuse MM & M of misrepresenting that Infocure was not in violation of laws when it issued its Opinion Letter, and of failing to disclose the Goldman Sachs retention and the impending Datamedic transaction.

3. CHANGE OF BUSINESS MODEL
Infocure's stock price in 1999 reflected the fact that it was a historically profitable company. Infocure's Third Quarter 1999 Form 10-Q was filed with the SEC on November 15, 1999 (Pla.'s Motion, Ex. Oo, Infocure 1999 Third Quarter 10-Q of 11/15/99.) The 10-Q reported earnings of approximately $0.36 per share based upon a net income of $10,408,000 through the nine months ending September 30, 1999. It was signed by Perlman, Fine and Price, who were at that time the senior officers of Infocure, being Chairman, President, and Vice President, respectively.
On December 22, 1999, Infocure filed a Form 8-K with the SEC, announcing its acquisition of VitalWorks. (Pla.'s Motion, Ex. MM, Infocure's 8-K of 12/22/99.) The 8-K consists of two paragraphs and four exhibits in the form of a press release. In it, Infocure states that:
[I]t has acquired VitalWorks as part of its strategy to deliver healthcare information technology to physicians as an Application Service Provider, or "ASP." Infocure plans to form VitalWorks.com, which will operate as a wholly-owned subsidiary of Infocure and will contain the operations of VitalWorks. In addition, Infocure will contribute to VitalWorks.com the business of those specialty practices that are most likely to adopt the ASP model. Infocure intends to conduct an initial public offering of up to 20% of the stock of VitalWorks.com during the first or second quarter of 2000.
(Pla.'s Motion, Ex. MM, Infocure's 8-K of 12/22/99 at 1-2.) Plaintiffs assert that this suggests that the main body of Infocure's business would remain unchanged, and that only a portion would be "spun off" into an ASP subscription model, through the medium of a wholly owned subsidiary. However, it appeared later that the acquisition of VitalWorks was the culmination of Infocure's plan to shift almost entirely to a subscription based pricing plan.
In March of 2000, Infocure announced the business model shift which had occurred in the fourth quarter of 1999, and identified over a dozen risk factors which existed in connection with the new ASP model and subscription pricing plan. Some of the risk factors included in Infocure's March 30, 2000 Form 10-K include: (1) the model is unproven and success depends on the acceptance of this model; (2) the company must set fees in the context of an undeveloped market, and incorrect fee setting could substantially affect profitability; (3) achieving market acceptance will require substantial sales and marketing efforts and expenditures of customers; (4) if Infocure fails to enter into strategic relationships or is unsuccessful in completing the development of its Internet solutions, the offering of ASP-delivered products may be delayed or never become available; (5) transition to subscription pricing model will initially adversely impact Infocure's cash flow. (Pla.'s Motion, Ex. XXX, complete copy of Infocure's 10-K at 11-16.) Plaintiffs assert that each and every one of the listed risk factors arose as of the time of the decision to convert the business model to provide ASP services on a subscription pricing basis, and should have been disclosed earlier than March, 2000. According to the Plaintiffs, the directors of Infocure could only have made the decision to switch business models after deliberately confronting and assessing these risk factors.
*1346 In early 2000, Infocure reported massive losses for the fourth quarter of 1999. Infocure directly attributed millions of dollars of charge-offs and write-downs in the Fourth Quarter of 1999 to Infocure's formal adoption of the new and admittedly unproven subscription-pricing plan and "ASP" business model. Plaintiffs contend that Infocure itself, in its public reports filed with the SEC and which were reviewed by its own auditors and attorneys, wholly attributes the swing of nearly a half-dollar per share in earnings, from positive to negative, to the ASP-subscription pricing decision. According to the "Notes to Consolidated Financial Statements" contained within Infocure's 1999 10-K, filed on March 30, 2000, Infocure described the changes in its business plan as follows:
In the fourth quarter of 1999, Infocure decided to restructure its business into a medical and a dental division, changed its product strategy to begin development of ASP-delivered products and Internet solutions, decided to transition to a subscription pricing model in connection with its change in product strategy, and completed six acquisitions. These changes in organization, product strategy and the pricing model have impacted certain of the Company's accounting policies as described herein and have caused the Company to evaluate the carrying value of certain assets and a restructuring of its operations to position the Company to maximize its new business model ...
(Pla.'s Motion, Ex. XXX, Infocure's 10-K at 46, F-10.) The Form 10-K went on to note that the Company recorded a writedown of its investment in capitalized software in the amount of $5.6 million in 1999. (Pla.'s Motion, Ex. XXX at 47, F-11.) As a result of Infocure's change in business model, Infocure shortened its good-will amortization period from fifteen to three years. (Pla.'s Motion, Ex. XXX at 47, F-11.) On December 20, 1999, Infocure suspended trading under the then outstanding S-3 registration statements, because this business model transition rendered the outstanding prospectuses invalid. (Pla.'s Motion, Ex. B, Burnham Dep. at 247-48.) Infocure filed a Form 8-K on or about December 22, 1999, and resumed trading under the S-3's on December 23, 1999. (Pla.'s Motion, Ex. MM, Infocure's 8-K of 12/22/99.)
As discussed above, the December 22, 1999, Form 8-K states that Infocure would be forming a subsidiary, "VitalWorks.com," which was to be "a wholly-owned subsidiary" of Infocure, and Infocure would "contribute to VitalWorks.com the business of those speciality practices that are most likely to adopt the ASP model." (Pla.'s Motion, Ex. MM, Infocure's 8-K of 12/22/99 at 3.) Plaintiffs argue that the December Form 8-K did not disclose that Infocure would be providing substantially all of its services through ASP or, indeed, that Infocure itself was switching to an ASP-based model. Furthermore, the Form 8-K does not state that there would be financial ramifications as a result of a change to a subscription-based pricing model. Despite its silence in the Form 8-K, Plaintiffs assert that at the time of the business model change, Infocure knew that there would be negative financial implications flowing from the business model change. (Pla.'s Motion, Ex. K, Cochran Dep. at 202; Exhibit PP, Perlman Dep. at 132-33.) According to the minutes of a "FY '00 Planning Meeting" held among members of the accounting department of Infocure, on or about November 5, 1999, the "Transition [to the subscription pricing model] will cause [a] sudden financial crisis." (Pla.'s Motion, Ex. RR, Minutes of Infocure's FY '00 Planning Meeting Notes.)
Plaintiffs contend that the "sudden financial crisis" did, in fact, occur. As a *1347 result of the adoption of a subscription pricing model, nearly $20 million of intangible assets were written off by Infocure in the fourth quarter of 1999. (Pla.'s Motion, Ex. SS, February 22, 2000 Press Release; Ex. QQ, Infocure 10-K/A of 5/30/00; Ex. VVV, Cochran Dep. at 205-07.) Substantially, as a result of those write-offs, Infocure, a profitable company until that time, posted a $3.8 million net loss for the year 1999. (Pla.'s Motion, Ex. QQ, Infocure's 10-K/A of 5/30/00.) The fourth quarter losses were greater than the previous nine months of cumulative earnings of over $10 million. This represents a negative swing in earnings of approximately $14 million, and generated a cumulative net loss for Infocure for all of 1999 of $0.14 per share. (Pla.'s Motion, Ex. QQ, Infocure 10-K/A of 5/30/00.) Plaintiffs assert that these operating losses were not disclosed to the CDL Plaintiffs or the public, until Infocure released its operating results in a press release dated February 22, 2000. (Pla.'s Motion, Ex. SS, Press Release of February 22, 2000.) Even then, the connection between the change in business model and Infocure's sudden and substantial losses was not fully explained until the 1999 Annual Report on Form 10-K filed on March 30, 2000. (Pla.'s Motion, Ex. XXX.)
Infocure's change to a subscription pricing model also directly resulted in Infocure's decision to revise the period it used to amortize goodwill from fifteen years to only three years. The goodwill carried on the books by Infocure at that time, which was acquired substantially as a result of Infocure's acquisitions of other businesses, exceeded $100 million. Thus, Infocure determined, in December, 1999, to write off an extra $28,999,999 per year of goodwill. This accelerated write-off of goodwill amounted to a $3.5 million charge just for the last six weeks of the 1999 year, according to Infocure's 1999 10-K. Changes to a subscription pricing model also caused Infocure to revise its estimates of its account receivable collectability. This assessment contributed additional pre-tax losses of $3 million. (Pla.'s Motion, Ex. XXX, complete copy of Infocure's 10-K at 46, F-10.) Plaintiffs assert that Infocure continued ahead with its acquisition strategy without disclosing the risks involved with its Fourth Quarter decisions.

4. CONSEQUENCES
Because of the write-downs of business goodwill and other intangible assets beginning in the fourth quarter of 1999, the asyet undisclosed but substantial attendant losses directly attributed by Infocure to the change in business model, the impending spin-off of a subsidiary which was to be known as VitalWorks.com, Inc., and acquisition discussions with Healtheon/WedMD, Burnham, once again, suspended trading under the outstanding S 3's on January 16, 2000. (Pla.'s Motion, Ex. VV, 1/16/00 Suspension fax.) Again, no notice of this suspension was provided to any of the Plaintiffs, despite the express terms of Section 4 of each of the applicable Registration Rights Agreements, nor was any amendment made to any of the outstanding prospectuses under any of the suspended S-3's. On January 24, 2000, Infocure's stock price reached its all time high of $37.625 per share. (Pla.'s Motion, Ex. WW, Yahoo! INCX Stock Historical Pricing.) All Plaintiffs were foreclosed from realizing this value for a substantial number of shares. Following Infocure's February 22, 2000, press release stating its 1999 year end earnings results, Burnham finally released the suspension on trading under the S-3's that had lasted five and one-half weeks.
The market reacted to the February 22 press release predictably, and Infocure's stock price immediately dropped. (Pla.'s Motion, Ex. WW, Yahoo! INCX Stock Historical Pricing.) On the day of the *1348 press release, the stock was trading at $22.00 to $24.00. Within three days, the stock was trading at $15.00 to $17.00. (Pla.'s Motion, Ex. WW.) On or about March 30, 2000, Infocure filed its 1999 Form 10-K with the SEC. (Pla.'s Motion, Ex. XXX, complete copy of Infocure's 10-K.) On April 11, 2000, Infocure filed a registration statement on Form S-3 covering the remainder of the Plaintiffs' unregistered securities. (Pla.'s Motion, Ex. AAA, Infocure's S-3 of 4/11/00.) On April 17, 2000, Infocure's stock price fell to under $10.00 per share. (Pla.'s Motion, Ex. WW, Yahoo! INCX Historical Stock Pricing.) Based on these facts, Plaintiffs moved for partial summary judgment against Infocure on the breach of contract claims, and against Infocure and MM & M as to the federal and state securities law claims. Plaintiffs have since settled with Infocure Corp; the claims against MM & M remain. MM & M moves this Court for summary judgment on all the pending claims against it.

II. SUMMARY JUDGMENT STANDARD
Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress and Co., 398 U.S. 144, 158-159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

III. DISCUSSION

A. SECURITIES LAW CLAIMS

1. RULE 10(b)5
Section 10(b) of the Securities Exchange Act of 1934 (hereinafter "Section 10(b)") prohibits any person from using, in connection with the sale of any security, any deceptive device in contravention of such rules and regulations as the Securities and Exchange Commission ("SEC") may prescribe. 15 U.S.C. § 78j(b). Based on this statute, the SEC has promulgated 17 C.F.R. § 240.10b-5 (hereinafter "Rule 10b 5") to prohibit the making of any untrue statement or omission of material fact that would render statements misleading in connection with the purchase or sale of any security. To succeed on a securities fraud claim under Rule 10b-5, a plaintiff must prove that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, (6) that proximately caused the plaintiff's injury. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir.1999); Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir.1997); Bruschi v. Brown, 876 F.2d 1526, 1528 (11th Cir.1989); Sturm v. Marriott Marquis Corp., 26 F.Supp.2d 1358, 1364-65 (N.D.Ga.1998).
In Basic v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court adopted the standard of materiality set out in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) for Section 10b and Rule 10b-5 securities fraud actions. Following TSC Industries, an omitted fact is material if there is a substantial likelihood *1349 that a reasonable shareholder would consider it important in deciding how to vote. TSC Industries, 426 U.S. at 449, 96 S.Ct. 2126. TSC Industries recognized that requiring companies to disclose every detail of corporate development would inundate shareholders with information of "dubious significance." Id. at 231, 108 S.Ct. 978. Such a requirement would do little for informed decision-making on the part of the shareholder. Id. Materiality, for purposes of a claim under Rule 10b-5, therefore, is fulfilled when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." Basic, 485 U.S. at 231-32, 108 S.Ct. 978. In short, a fact is material if a reasonable investor would consider that fact important to his decision to invest. Id. at 231, 108 S.Ct. 978.
Scienter is the mental state required to be proved in order to establish liability for a Rule 10b-5 securities fraud claim. The Supreme Court has defined the level of scienter necessary to support such a claim as a mental state embracing "intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Eleventh Circuit, this mental state encompasses not only an actual intent to deceive, but also "severe recklessness." The Eleventh Circuit has defined "severe recklessness" as follows:
Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers and sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.
Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir.1999) (citing McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir.1989)).
For a federal securities claim, justifiable reliance means that the plaintiff "reasonably relied" on the specific alleged misstatement. Pelletier v. Zweifel, 921 F.2d 1465, 1510 (11th Cir.1991). The Eleventh Circuit explained this in Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042 (11th Cir.1987) as follows:
A showing of Plaintiffs' reliance on the misrepresented or omitted information is necessary to satisfy the fourth element of a Rule 10b-5 cause of action. This Circuit requires `reasonable reliance' upon the material misrepresentations, a test of subjective reliance tempered by the requirement of `due diligence' on the part of the plaintiff. Not only must an individual actually rely on the information provided, this reliance must be `justifiable', i.e. with the exercise of reasonable diligence one still could not have discovered the truth behind the fraudulent omission or misrepresentation.
Id. at 1046 (citations omitted). The Eleventh Circuit has delineated several factors to be applied in determining whether there was justifiable reliance:
Determinations of whether an investor's reliance was justified requires the consideration of all relevant factors, including: (1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant to the plaintiffs; (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or *1350 sought to expedite the transaction; and (8)[sic] the generality or specificity of the misrepresentations. No single factor is mispositive; all must be considered and balanced in determining whether reliance was justified.
Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir.1989) (citations omitted). In a case of mixed representation and omission, as opposed to a case based purely on omissions or "fraud on the market" theory, there is no presumption of reliance; rather, justifiable reliance must be shown as to the entire claim. Where the defendants are charged both with material misrepresentations and omissions, the Affiliated Ute presumption of reliance does not apply. Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 722 (11th Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 1221, 99 L.Ed.2d 421 (1988); In re Sahlen & Assocs., Inc. Securities Lit., 773 F.Supp. 342, 354 (S.D.Fla.1991).
Finally, a plaintiff in a Rule 10b-5 action must show that his reliance upon the material misrepresentation or omission was a cause of his damages. In the Eleventh Circuit, a plaintiff need not show that the misrepresentations or omissions were the sole cause of the losses, but must "only show that it was `substantial,' i.e., a significant contributing cause [of the loss]." Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir.1997) (citations omitted). In other words, a plaintiff will prevail when he shows that the misrepresentation or omission at issue "touches upon the reasons for the investment's decline in value." Id.

(A) MEDFAX PLAINTIFFS
MM & M's Opinion Letter forms the basis of the Medfax Plaintiffs' securities laws claims against the law firm. Plaintiffs assert that MM & M had an independent duty to disclose the Datamedic transaction and Goldman Sachs' retention based on MM & M's status as a participant, and that MM & M affirmatively made a material misrepresentation when it opined that Infocure was not in violation of any state or federal laws. In my opinion, MM & M had no duty to disclose the Datamedic negotiations or the Goldman Sachs' retention to the Plaintiffs, and no misrepresentations were made in the Opinion Letter which are actionable under state or federal securities laws.
"Any person or entity including a lawyer, accountant, or bank who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met." Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (emphasis in original). The principal holding of the Supreme Court in Central Bank was that there is no aiding or abetting liability under Rule 10b-5. Id. at 178-79, 114 S.Ct. 1439. In other words, following Central Bank, a law firm may not be held liable for securities fraud merely because it played a substantial role in the transaction at issue. The Eleventh Circuit in Ziemba v. Cascade Int'l Inc., 256 F.3d 1194 (11th Cir.2001), recently applied the rational of Central Bank to narrow further the scope of liability of attorneys and other secondary actors in securities fraud cases. The court in Ziemba held that:
[I]n order for [a secondary actor, such as a law firm or accounting firm] to be primarily liable under § 10(b) and Rule 10b-5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made.
*1351 Id. at 1205. Because Plaintiffs rely on the Defendant's Opinion Letter, they have satisfied the requirement that a statement be publicly attributed to the secondary actor.
MM & M can be liable for omissions, however, only if it had a duty to disclose. The determination of whether there is a duty to disclose must be made on a case-by-case basis, "depending on the circumstances of the case." Id. at 1206-07. The factors identified by the Eleventh Circuit to be considered include: (1) "the relationship" between the parties; (2) their "relative access to the information" at issue; (3) "the benefit derived by the defendant" from the transaction; (4) the "defendant's awareness of Plaintiffs' reliance" on defendant in making its investment decision; (5) "the extent of the defendant's knowledge", (6) "the significance" of the omitted information; and (7) "the extent of the defendant's participation in the fraud." Id. at 1206. The Ziemba court added that these factors must be weighed in the context of the attorney's obligations and duty of loyalty to his or her client. Id. at 1207 (citing Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir.1986)).
Application of these factors in this case leads me to the conclusion that MM & M did not have an actionable duty to disclose to the Medfax Plaintiffs. Importantly, the Medfax Plaintiffs were represented by their own counsel who had direct access to Infocure. Their counsel could have asked any questions they wished about any of the information involved. During the closing, Plaintiff Runde consulted with his Robinson Bradshaw lawyers and continued to use the firm as his counsel after the transaction closed. (Pla.'s Motion, Ex. Q, Runde Dep. at 218-19.) No attorney client relationship existed between MM & M and Plaintiffs. In Ziemba, the Eleventh Circuit relied upon this to conclude that no securities fraud liability could be imposed on the defendant law firm. Id. at 1206. Without a fiduciary obligation, it can hardly be said that the attorney for one party owes a duty to the opposing party, who was represented by competent lawyers of his own choice. This factor weighs heavily against finding a duty to disclose on behalf of MM & M.
The Medfax Plaintiffs have also failed to show that MM & M was aware of the individual Medfax Plaintiffs' reliance on the Opinion Letter. The MM & M Opinion Letter expressly states that it is given only to the Medfax Corporation, and not to the individual Medfax Plaintiffs. Although other agreements entered into during the merger transaction were addressed to Medfax corporation and the individual Medfax Plaintiffs, the MM & M Opinion Letter was directed only to the Medfax corporation and Finova Financial Capital. Plaintiffs argue that the distinction should be ignored because the individual Medfax Plaintiffs were the sole officers, directors and shareholders of the Medfax corporation. However, persons acting in a corporate capacity, and who execute or receive documents in that capacity, are not deemed to be acting in an individual capacity unless expressly stated. Brega v. CSRA Realty Co., 223 Ga. 724, 726, 157 S.E.2d 738 (1967). Therefore, if the Opinion Letter was addressed to the Medfax corporation alone, then only the Medfax corporation or its successor in interest could rely on the letter. Contrary to the Medfax Plaintiffs' assertion, they are not the successor in interest. Because Medfax corporation merged into Infocure, the resulting corporation, Infocure, is the successor in interest.
Furthermore, the MM & M Opinion Letter expressly provides that it is given under, and is subject to, the Legal Opinion Accord of the ABA Section of Business Law. Thus, the Opinion Letter states:

*1352 This Opinion Letter is governed by, and is to be interpreted in accordance with the Legal Opinion Accord (`the Accord') of the ABA Section of Business Law (1991). As a consequence, it is subject to the assumptions, qualifications (including the General Qualifications), exceptions, definitions, limitations, on coverage and other limitations, all as more particularly described in the Accord. This Opinion Letter should be read in conjunction therewith.
(Def.'s Motion[2], Ex. E, Letter from MM & M to Medfax Corp. of 8/31/99 at 1-2.) The Accord expressly limits the "use" of the opinion to the Opinion Recipient:
Only the Opinion Recipient is entitled to rely upon or to assert any legal rights based upon the Opinion Letter, and the Opinion Recipient may rely on the Opinion only for the purpose contemplated by the Transaction documents. If a different arrangement is intended, then the Opinion Letter or a separate writing signed by the Opinion Giver should specify any other person entitled to rely, and (if relevant) under what circumstances and to what extent. Without the Opinion Giver's prior written consent, the Opinion Letter may not be used or relied upon by the Opinion Recipient or any other person for any other purpose whatsoever ...
Legal Opinion Project, Third-Party Legal Opinion Report, 47 Bus. Law. 1, 41-42 (1991) [hereinafter "ABA Accord"]. It is undisputed that there was no such separate writing in the instant case, and the Opinion Letter states only that its recipient may rely on its contents. The Opinion Recipient is defined in the Glossary of the Accord as "the addressee or addressees of the Opinion Letter." (ABA Accord at 2.) Again, it is undisputed that MM & M's Opinion Letter was addressed to the Medfax Corporation and not to the individual Medfax Plaintiffs. Consistent with this express limitation contained in the ABA Accord, Mr. Haury testified that "the opinion was not being tendered to your clients [the Medfax Plaintiffs]." (Def.'s Motion, Ex. V, Haury Dep. at 165.) Mr Haury testified:
Q. (By Mr. Frank) A few minutes ago you made a point I think quite emphatically that at no time did you understand that you were tendering an opinion to the shareholders of the target companies. Is that your view?
A. That's correct.
Q. And that was your view at that time?
A. Uh-huh. In fact, the opinion clearly states that only the recipient can rely on it, and the recipient was the target.
(Def.'s Motion, Ex. V, Haury Dep. at 172). Pursuant to the ABA Accord the Medfax Plaintiffs are not entitled to rely on the contents of the Opinion Letter. The Plaintiffs' inability to rely on the Opinion Letter further negates their claim that MM & M had a duty to disclose.
The remaining factors in the duty to disclose analysis are not in favor of the Plaintiffs. There is no evidence that the Plaintiffs were denied access to information about Infocure. Although MM & M of course had undisclosed knowledge about Infocure, as its attorney, MM & M enjoyed a privilege (if not a duty) not to disclose confidential information. See, Ziemba, 256 F.3d at 1206-07. Also, MM & M derived no additional benefit from the transaction, above and beyond its fee as legal counsel. A fee alone can not be considered a positive factor or every legal representative to a transactional client could find itself owing a duty to the third party involved.
*1353 This case is on all fours with Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194 (11th Cir.2001), where the Eleventh Circuit held that the mere fact that a law firm had played a significant role in drafting, creating, reviewing or editing a corporation's allegedly fraudulent letters and press releases was an insufficient basis for holding it primarily liable under Rule 10b-5. Id. at 1205-08. The court held that the defendant law firm had no duty to make any disclosures concerning its client to the plaintiffs. First, there was no attorney-client relationship between plaintiffs and the law firm that might have created a fiduciary obligation on the part of the law firm. Id. at 1206; see, Schatz v. Rosenberg, 943 F.2d 485, 492 (4th Cir.1991) (holding that "unless a relationship of `trust and confidence' exists between a lawyer and a third party, the federal securities laws do not impose on a lawyer a duty to disclose information to a third party"). Second, fiduciary responsibilities owed to the client by the defendant law firm created a privilege not to disclose certain information. Id. at 1206-07; see, Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir.1986) ("Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose. To the contrary, attorneys have privileges not to disclose.") (internal citations omitted). Third, there were no statements attributed to the defendant on which the plaintiffs could rely. Id. at 1207. For these reasons, the Eleventh Circuit held that the defendant law firm had no duty to disclose information to the plaintiffs.
Similar factors are present in the instant case. No attorney client relationship existed between Plaintiffs and MM & M. Each Plaintiff participated in the transaction negotiations and closings through individual attorneys, who generally remained Plaintiffs' attorneys even after the transaction closed. As the attorney for Infocure, MM & M enjoyed certain privileges not to disclose information about the company in the absence of a duty to do so. And finally, as I have already noted, the Plaintiffs were not entitled to rely on the Opinion Letter issued by MM & M because it was addressed solely to the Medfax corporation. Bound to follow the Eleventh Circuit's precedent in Ziemba, I hold that MM & M had no duty to disclose the Datamedic negotiations or the Goldman, Sachs retention to Plaintiffs.
Even if there had been a duty of disclosure, the alleged omissions were not material to the Medfax Plaintiffs. The Medfax Plaintiffs contend that they should have been told that Infocure had hired Goldman, Sachs in July, 1999, to review strategic alternatives for Infocure, including a possible sale of Infocure. They base that allegation on the fact that, two weeks prior to their closing, Infocure did disclose that information to Plaintiff Hafner in the Glentec merger. (Def.'s Motion, Ex. H, Confidentiality Agreement of 8/18/99.) However, Goldman, Sachs's engagement was ended after the August 18, 1999, Glentec closing and before the Medfax transaction closed on August 30, 1999. As Infocure's CEO Cochran explained:
However, the events that transpired in early August, the information was disseminated by Goldman Sachs to selected potential acquirers and received negligible response. And in this time frame as well [as] the company's stock suffered a bit of a decline in August. The company's management was not interested in having this engagement with Goldman Sachs be viewed as shopping the company and in the latter part of August told Goldman Sachs to stand down, to not go forward with the auction concept ... [T]here was verbal communication between management and Goldman Sachs *1354 to stand down is the term I would apply to it.
(Def.'s Motion, Ex. Y, Cochran Dep. at 167-68.) Cochran further stated that:
[T]he sequence of events is such that at the time the Hafner merger was completed the Goldman Sachs activity was underway but by the time the other transactions had been completed they had been asked to stand down. So in our view at that point the possibility of the transaction was not on the horizon.
(Def.'s motion, Ex. Y, Cochran Dep. at 175.) Plaintiffs have offered no evidence to the contrary.
This kind of preliminary overture which is then dropped is not material and need not be disclosed. Indeed, that would be true even if the Goldman Sachs engagement had not ended. For example, in Sturm v. Marriott Marquis Corp., 26 F.Supp.2d 1358 (N.D.Ga.1998), the defendants bought out the plaintiffs' interest in real estate limited partnerships without disclosing that they were considering doing a conversion into a REIT. However, the "potential REIT reorganization" had not "progressed beyond the preliminary considerations." Id. at 1369. This Court held that such a matter was immaterial as a matter of law, explaining that "the law is clear that an internal exploration of a potential business restructuring does not rise to the level of materiality required to state a claim for securities fraud." Id. at 1370 (citing Panfil v. ACC Corp., 768 F.Supp. 54, 58-59 (W.D.N.Y.), aff'd, 952 F.2d 394 (2d Cir.1991) ("[M]ere `intention' to pursue a possible merger at some time in the future, without more is simply not a material fact under Rule 10b-5")). As the court in Nelson v. Paramount Communications, 872 F.Supp. 1242 (S.D.N.Y.1994) explained:
Even if one stretches the concept of preliminary negotiations as far as it can go, remaining in contact with someone after one has broken off formal negotiations does not deem to be included. Stated another way, to call this state of affairs material would make just about anything at all material.
Id. at 1246. Finally, Plaintiffs' failure to address the Defendants' argument as to the Goldman, Sachs retention indicates an abandonment of this claim.
Plaintiffs' argument as to the Datamedic negotiations proceeds as follows: (1) consummation of the Datamedic transaction if it occurred in November 1999, was going to require Infocure to restate its historical financial statements to take account of its pooling-of-interests with Datamedic; (2) Infocure was going to decide in November that it would not do the restatement at that time; and (3) without the restatement, Infocure would not be able to file the Form S-3 registration statement so that the Medfax Plaintiffs' Infocure stock would not be registered by the dates that Infocure promised. However, there is no evidence that, at the time of the Medfax closing, Infocure did not intend to do the restatement when the Datamedic transaction would close, much less that MM & M had any reason to believe that Infocure would not comply with its obligations to the August Plaintiffs. As explained by Leah Aldridge of MM & M, who had several conversations with Infocure's CEO Cochran in August,1999, before the closing of the Medfax transaction:
Q: In any of those conversations you had with [Mr.] Cochran at Infocure regarding pooling matters, did [Mr.] Cochran say anything to the effect that he had any knowledge that registrations would have to be delayed due to the pooling of interest transaction closing? A: No.
(Def.'s Motion, Ex. II, Aldridge Dep. at 124-25.) At the time, MM & M was actively working on a Form S-4 registration *1355 in connection with the Datamedic transaction, (Def.'s Motion, Ex. HH, Brewer Dep. at 85-86, 102; Ex. S, Bill no. 156527 from MM & M to Infocure Corp. of 9/9/99), and MM & M had every reason to believe Infocure would do whatever the transaction required. Indeed, in November when the restatement issue surfaced and Infocure decided to defer doing the restatement, MM & M was in the process of preparing a registration statement on Form S-3 and believed that it would be given the "green light" by Infocure to file. (Def.'s Motion, Ex. U, Burnham Dep. at 90, 168-69, 444-45, 479-83; see also, pp. 244, 249, 412, 430-31, 450; Ex. M, Bill no.162408 from MM & M to Infocure Corp. of 12/16/99.)
It was only then, in November, that Infocure decided not to do the restatement in order not to divert Infocure's accounting personnel from other business transactions that Infocure was working on, so that the Form S-3 that MM & M was then preparing could not be filed. As Cochran has testified:
Q: ... Is Infocure aware of any facts relating to any decision by Infocure to register any unregistered shares of Infocure stock from August 1, 1999, until June 1, 2000?
MR. SMITH: Objection; overbroad.
You can answer.
A: I'll answer it yes. But from the period mid-November forward and what had occurred in early November is the company's completion of a pooling of interest merger with Datamedic Corporation. What this meant was that in order to have financial information in a form that could be included in a registration statement, the company would need to restate its financials for this pooling of interest for all the prior periods that had been filed. Basically three years of financial information has to be restated. In addition to which in mid-November that restatement process would incorporate not only the period up through June 30 which had been previously included in a restatement of financial statements but would also now incorporate the third quarter. The availability of resources, the cost, the timing made that a very difficult talk to accomplish from about mid-November forward.
Q: (By Mr. Frank) And that's because and only because the pooling of interest transaction with Datamedic and Infocure?
A: There are other facts that add to the complexity.
Q: What other facts?
A. In that time frame the company was involved in merger discussions with another entity.
Q. What's the name of that other entity?
A: Per-Se Technologies.
(Def.'s Motion, Ex. Y, Cochran Dep. at 62-63.) Cochran further testified:
Q: ... Were there any other facts that you can identify that precluded the registration of shares from mid-November 1999 forward in time?
A: In the November timeframe as well, the company was also involved in a number of acquisitions. There were ten acquisitions as I recall that were made in that time frame. And in that November-December time period we were involved in financial due diligence and legal due diligence surrounding these acquisitions, all of which served to constrain the available resources that were able to be put on any other projects.
(Def.'s Motion, Ex. Y, Cochran Dep. at 65-66; see also, pp. 91, 123.) Only with the benefit of hindsight does the Datamedic transaction become material to the Medfax Plaintiffs. MM & M is not liable for securities *1356 fraud for failing to anticipate and disclose a business decision made months after the fact by its client that ultimately damaged the Plaintiffs because of the collapse of Infocure stock months after that. Accordingly, MM & M is not liable for the omissions relied upon by Plaintiffs.
Plaintiffs assert that the "no violation of law" provision in MM & M's Opinion Letter affirmatively misrepresented that Infocure had not violated federal and state securities laws. The "no violation of law" provision reads:
Based upon the foregoing [including two Certifications by Infocure discussed below], it is our opinion that:
* * *
The execution and delivery by each of Parent and Subsidiary of the Acquisition Documents to which it is a party do not, and if Parent and Subsidiary under the Acquisition Documents such performance would not, result in any
* * *
Violation of any existing federal or state constitution, statute, regulation, rule. Order, or law to which [Infocure] or their respective assets are subject.
(Def.'s Motion, Ex. E, Letter from MM & M to Medfax Corp. of 8/31/99 at 2-3.) I will assume without deciding that the Plaintiffs may rely upon the Opinion Letter in a Rule 10b-5 action notwithstanding the ABA Accord's limitation upon reliance to the recipient of the letter.
MM & M contends that the ABA Accord controls and limits the meaning and scope of the "no violation of law" provision of the Opinion Letter. This warrants some additional discussion of the Accord. The Accord arose as a response to the custom and practice of lawyers representing the parties to give third party opinion letters in substantial business transactions such as mergers and acquisitions. Prior to adoption of the ABA Accord, third party opinion letters were negotiated for each transaction; there were no standards governing their content or interpretation. The ABA Accord was adopted by the Business Law Section of the ABA in 1991. (Def.'s Motion, Ex. UU; ABA Accord.) It contains extensive commentary and other explanation on the meaning, scope and interpretation of the opinion letter. The ABA Accord provides:
This Accord may be adopted and made to govern the Opinion by a declaration in the Opinion Letter substantially as follows:
This Opinion Letter is governed by, and shall be interpreted in accordance with, the Legal Opinion Accord (the `Accord') of the ABA Section of Business Law (1991). As a consequence, it is subject to a number of qualifications, exceptions, definitions, limitations on coverage and other limitations, all as more particularly described in the Accord, and this Opinion Letter should be read in conjunction therewith.
(Def.'s Motion, Ex. UU, ABA Accord, § 22 at 43-44.) The Commentary to that section explains:
"[A]cceptance by the Opinion Recipient of the Opinion Letter containing such a declaration will constitute conclusive evidence of (i) its willingness to have the Opinion governed by the Accord, (ii) its agreement to any limitation of the Opinion Giver's scope of inquiry properly described in the Opinion Letter (see § 2 and ¶ 2.1), (iii) the Opinion Letter's agreed opinion coverage (see ¶ 7.1) ..."
(ABA Accord, ¶ 22.1, Commentary to § 22 at 44.)
*1357 The ABA Accord gives the Opinion Giver the right to rely on the information provided by its client and others:
The Opinion Giver:
(a) may rely ... upon information provided by Client officials and others, if in each case the provider ... is reasonably believed by the Opinion Giver to be an appropriate source for the information without:
(i) investigation;
(ii) statement of the reliance in the Opinion Letter; or
(iii) analysis of any underlying data supporting information contained in a certificate (e.g., confirmation of compliance with a financial covenant) ...
(ABA Accord, § 3 at 6-7.) The ABA Accord also permits the Opinion Giver to assume that the parties to the underlying transaction have acted appropriately and honestly:
The Opinion Giver may rely, without investigation, upon the assumptions set forth below unless in a given case the particular assumption states, directly or in practical effect, a legal conclusion expressed in the Opinion.
* * *
(e) Each document submitted to the Opinion Giver for review is accurate and complete ...
* * *
(g) There has not been any mutual mistake of fact or misunderstanding, fraud, duress or undue influence. (h) The conduct of the parties to the Transaction has complied with any requirement of good faith, fair dealing and conscionability.
* * *
(n) The Client will not in the future take any discretionary action (including a decision not to act) permitted under the Transaction Documents that would result in a violation of law or constitute a breach or default under any Other Agreement or Court Order.
* * *
(p) All parties to the Transaction will act in accordance with, and will refrain from taking any action that is forbidden by, the terms and conditions of the Transaction Documents.
These assumptions need not be stated in the Opinion Letter. The Opinion Giver may also rely, without express investigation, upon other assumptions expressly stated in the Opinion Letter.
(ABA Accord, § 4 at 8-10.)
Section 16 of the ABA Accord explains the meaning of a "no violation of law" opinion that is subject to the Accord:
When a No Violation of Law Opinion is given, it means execution and delivery by the Client of, and performance by the Client of its agreements in, the specified Transaction document neither is prohibited by, nor subjects the Client to a fine, penalty or other similar sanction under, any statute or regulation of the Opining Jurisdiction that a lawyer in the Opining Jurisdiction exercising customary professional diligence would reasonably recognize as being directly applicable to the Client, the Transaction, or both.
(ABA Accord, § 16 at 34.) The Commentary to § 16 further explains:
This opinion does not directly address the rights the parties have bargained for vis-a-vis each other. It addresses the issue of whether performance by the Client of the obligations undertaken by it in the specified Transaction Document will expose the Client to a sanction for violating a statutory or regulatory prohibition (either civil or criminal in nature). It also provides additional assurance *1358 that such performance is not prohibited by any statute or regulation of the Opining Jurisdiction. And unlike the stock insurance opinion, it does not focus on the legal status of the shares of the rights of holders as against the issuer.

(ABA Accord, ¶ 16.1, Commentary to § 16 at 35 (emphasis added).) Paragraph 16.4 adds:
The definition of the No Violation of Law Opinion, appearing in the Glossary, does not use the all inclusive defined term `Law.' This is deliberate. In contrast to the Remedies Opinion (see § 10), common law doctrines, such as those of contracts or torts, are not addressed because the opinion applies only to violations of applicable provisions of statutory law and regulation. Common law doctrines, unlike statutes, are not ordinarily thought of as capable of being violated. Nor does this opinion address provisions of Law that neither prohibit the conduct in question nor impose a fine, penalty or other similar sanction for a violation.
(ABA Accord, ¶ 16.4, Commentary to § 16 at 36.) In a section entitled "Limitations," the ABA Accord provides:
An Opinion deals only with the specific legal issues it explicitly addresses. Accordingly, an express opinion concerning a particular legal issue does not address any other matters.
(ABA Accord, § 18 at 38.) More specifically, as to the matters at issue in this litigation the Accord states:
It is a basic principle of this Accord that the Opinion will deal in a direct way with any specific legal issue to be addressed. In this connection, an Opinion does not address any of the following legal issues unless the Opinion Giver has explicitly addressed the specific legal issues in the Opinion Letter:
(a) Federal securities laws and regulations administered by the Securities and Exchange Commission ... [and] state "Blue Sky" laws and regulations
...
(ABA Accord, § 19 at 39.) Consistent with this express limitation of the ABA Accord, Mr. Haury, the signatory of the MM & M Opinion Letter testified that "the opinion letter does not address securities law", and "we are making no opinion as to whether the company was in compliance with the securities laws", and "the opinion letter doesn't extend to securities disclosure." (Def.'s Motion, Ex. V, Haury Dep. at 140-41, 161-66, 260.)
As illustrated by the above quoted passages, an Opinion Letter subject to the ABA Accord contains many limitations on its scope. Specifically, the "no violation of law" provision in the Opinion Letter does not relate to Infocure's overall compliance with securities laws. Instead, the Opinion Letter simply confines itself to the execution of the transaction documents and the obligations thereunder. MM & M opined that these actions would not give rise to the violation of any federal or state statutes. This assurance is limited compared with the Plaintiffs' proposed interpretation which has MM & M opining as to Infocure's compliance with all of the disclosure mandates of federal securities laws. If the Court were to interpret MM & M's "no violation of law" provision to encompass overall compliance with securities laws, every law firm which submitted an opinion letter would open themselves to possible securities fraud claims. Incorporation of the ABA Accord in opinion letters reduces wasteful and duplicitous opinion drafting and negotiations in individual transactions. Enforcement of the Accord by the courts gives the parties and their attorneys a clear understanding of their rights and obligations. If one party to a transaction wants more protection, it remains free to try to obtain that through negotiation. Plaintiffs' reliance upon Kline v. First *1359 Western Government Securities, Inc., 24 F.3d 480 (3rd Cir.1994) is misplaced because that case did not involve an opinion letter subject to the ABA Accord. In any event, I find Judge Greenberg's dissent in that case more persuasive and consistent with Eleventh Circuit precedent than the majority opinion. In a case such as this, I see no compelling public policy justification for disregarding disclaimers in third party opinion letters in complex transactions involving sophisticated businessmen all of whom have their own independent counsel. For these reasons, I will deny the Medfax Plaintiffs' Motion for Partial Summary Judgment and grant Defendant's Motion for Summary Judgment as to the federal securities law claims.

(B) MEMMINGER
There is only one notable difference between Memminger and the Medfax Plaintiffs. The Opinion Letter given in the Memminger transaction, while addressed to SDM Corporation, was put to the attention of Joseph Memminger. Without acknowledging that the Medfax Plaintiffs' claims failed to meet the reliance requirement, Plaintiffs counsel suggested at oral argument that this difference would distinguish Memminger's case against MM & M from that of the Medfax Plaintiffs. I do not agree. The letter is still addressed to SDM. The practical consequence of adding an attention notice does not change my conclusion that the corporation was the Opinion Recipient. Plaintiff Memminger argues that there was no difference in identity among Joseph Memminger as shareholder or president of SDM and Joseph Memminger individually. This argument completely ignores basic corporation law. If a corporate officer acts on behalf of the corporation, then he is not considered to be acting in his individual capacity, unless so stated. Brega, 223 Ga. at 726, 157 S.E.2d 738. Therefore, it is incorrect that there is no difference between Plaintiff Memminger's capacity as president of SDM, Inc. and that of shareholder and individual. Plaintiff Memminger's Motion for Summary Judgment is denied on the same grounds as the Medfax Plaintiffs. Similarly, Defendant's motion is granted.

(C) CDL PLAINTIFFS
The CDL Plaintiffs' transactions closed on December 30, 1999. At this time, Plaintiffs assert that MM & M committed securities fraud through the issuance of the Opinion Letter in connection with the transaction. This Letter contained a "no violation of law" provision identical to the one identified in the Medfax transaction. These Plaintiffs argue that the "no violation of law" provision necessarily opined as to Infocure's compliance with federal and state securities laws because the underlying transaction involved the sale of their company for Infocure stock. The Plaintiffs then point to a host of facts not disclosed by Infocure which they contend constitute securities fraud. This argument is not persuasive in light of Section 19(a) of the Accord. By incorporating the Accord into its Opinion Letter, MM & M was entitled to rely upon the fact that its letter did not express an opinion as to its client's compliance with federal or state securities laws.
Plaintiffs also allege that MM & M made a misrepresentation by stating that "to our knowledge ... no litigation against Parent or Subsidiary ... which would have a material adverse effect on the operation of the businesses of Parent or Subsidiary is pending or overtly threatened by a written communication to Parent or Subsidiary." (Pla.'s Motion, Ex. TTT, CDL MM & M Opinion Letter). Plaintiffs assert that MM & M possessed knowledge of Plaintiff Hafner's threat of litigation and the facts pertinent to the failure to register the Medfax Plaintiffs and Memminger's *1360 shares. This statement, together with the omitted information, suffices to confer securities fraud liability upon MM & M, according to the Plaintiffs. For the following reasons, however, I hold that the Plaintiffs have failed to make out a Rule 10b-5 claim against MM & M on this ground.
First, as in the case of the Medfax Plaintiffs and Memminger, the CDL Plaintiffs' claim for securities fraud fails for lack of reliance. MM & M addressed its Opinion Letter to CDL Corporation; the individual CDL Plaintiffs were not the recipients of the letter. As noted above, the provisions of the ABA Accord, and the terms of the Opinion Letter itself, prevent anyone other than the CDL Corporation from relying on the letter's contents. Second, Plaintiffs have failed to establish a false statement or omission. My reasoning regarding the "no violation of law" provision stated previously applies here as well. The statement in the letter dealt with the consequences of the execution and delivery of the transaction documents, not with the state of Infocure's securities disclosures in general. Also, MM & M did not omit to state material information.
Plaintiffs also allege that MM & M's failure to disclose Plaintiff Hafner's threat of litigation over the failure to register his stock constitutes securities fraud. This alleged threat was contained in a letter to MM & M, dated December 21, 1999. However, MM & M was expressly told and understood from the Infocure executives who were in direct contract with Hafner, that he had acquiesced in the delay in registration of his shares, and that he was not threatening litigation. (Def.'s Motion 1:01-CV-0001-TWT [Doc. 38], Ex. U, Burnham Dep. at 55-58, 82-84, 187, 198, 235, 302-03, 306-09, 430-31, 439, 451, 462-63; Ex. HH, Brewer Dep. at 21-22; Ex. V, Haury Dep. at 102-06, 121-22, 216, 243; Ex. Z Perlman Dep. at 60-61, 91, 111, 126; Ex. AA, Price Dep. at 46, 53.) Indeed, Hafner himself testified:
"Q. And this is the first correspondence, this March 28th 2000 letter, in which you or your attorneys had mentioned to Mr. Perlman or talked about suing, right?
MR. FRANK: Objection. The writings speak for themselves. You may answer.
A. The writing speaks for itself. That's the first time, yeah, that we had mentioned suing."
(Def.'s Motion 1:01-CV-0001-TWT [Doc. 38], Ex. WW, Hafner Dep. at 256-57). Moreover, a fair reading of the December 21, 1999, letter from Hafner's counsel is that it was a demand letter, not a threat of litigation. (Pla.'s Motion, Ex. NN, Letter from Thomas to Burnham of 12/21/99; Haury Dep. at 259; Burnham Dep. at 499; Fine Dep. at 145.) Although Hafner's attorney demands the registration of his client's shares in accordance with the Registration Rights Agreement, he makes no threat of litigation in the December 21, 1999, letter.
Similarly, the fact that Infocure had not registered the shares of the other Plaintiffs stock does not make MM & M's no threat of litigation statement rise to the level of a fraudulent misrepresentation. The Opinion Letter explicitly states that it is limited to litigation threatening a "material adverse effect" on Infocure's operations that "is pending or overtly threatened by a written communication" to Infocure. (Pla.'s Motion, Ex. TTT, Letter from MM & M to CDL of 12/30/99.) It is undisputed that the August Plaintiffs had made no written threat of litigation to Infocure at the time of the CDL closing. Additionally the provisions of the ABA Accord dictate the same outcome. Paragraph 17.3 of the Commentary to the ABA Accord states:

*1361 ¶ 17.3 Limited to written communications. Because it is so often difficult to judge whether oral communications regarding disputes constitute actual threats of legal proceedings, the confirmation in the Opinions Letter relates only to legal proceedings that have been overtly threatened by a written communication.
(ABA Accord, ¶ 17.3, Commentary to § 17 at 37-8.) The ABA Accord clearly limits the confirmation of the threatened litigation to written communications. The CDL Plaintiffs' counsel testified that they were familiar with the Accord and its provisions. Indeed, the CDL Plaintiffs' counsel made its own Opinion Letter subject to the ABA Accord. (Def.'s Motion 1:01-CV-0001-TWT [Doc. 38], Ex. GG, Letter from Akerman, Senterfitt & Eidson, P.A. to Infocure Corp. of 12/30/99.) For these reasons I hold that MM & M did not make a false misrepresentation regarding the threat of litigation.
As to any alleged misrepresentation or omission regarding Infocure's change in business model, there is no evidence that MM & M had any knowledge as to this event and its impact on Infocure's profitability. The only evidence the CDL Plaintiffs provide is that on or about December 17, 1999, Oby Brewer, the lead securities partner at MM & M who was handling the Infocure matters, sold approximately $640,000 worth of his personal holdings of Infocure stock. The sale was 13 days prior to the CDL purchase of in excess of $3 million of these shares. Mr. Brewer's trade also occurred just three days prior to the time when trading under the outstanding S-3 registration statements had been suspended by Infocure, through MM & M. It was also only a few days before the filing by Infocure, with MM & M's assistance, of an 8-K which mentioned that Infocure would be beginning to provide "ASP" services. (Pla.'s Motion, Ex. MM, Infocure's 8-K of 12/22/99; Ex. QQQ, Brewer's trade summary.) Mr. Brewer sold this block of Infocure stock without telling his partners or anyone at Infocure. (Pla.'s Motion, Ex. Qq, Brewer Dep. at 166-67.) In their brief, the CDL Plaintiffs allege that although the stock price of Infocure was, in fact, rising at the time, Mr. Brewer apparently knew some information of which other persons did not have the benefit, because Infocure's stock dropped precipitously shortly thereafter. The CDL Plaintiffs also cite to Mr. Brewer's sale of the rest of his Infocure stock in February 2000, at the same time as the information regarding Infocure's negative earnings in the fourth quarter of 1999 was scheduled to be released. These two sales account for all the evidence the CDL Plaintiffs offer for the conclusion that MM & M had actual knowledge of the negative impact the change in business model would have on Infocure's fourth quarter financials.
In my judgment, however, Mr. Brewer's sale of his stock, without more, is insufficient to show actual knowledge of the change in business model. Mr. Brewer testified that his December 17th sale was occasioned by Infocure's statement to him that day that Infocure was transferring its securities work from MM & M to King & Spalding (Def.'s Motion 1:01-CV-0001-TWT [Doc. 38]; Ex. HH, Brewer Dep. at 19-20) and his February sales occurred on and after the day of Infocure's Feb. 22nd press release by Infocure announcing its 1999 earnings. In any event, the testimony of the Infocure Defendants is that even they did not know in December, 1999, that Infocure would suffer as a result of its adoption of an ASP business model. (Def.'s Motion 1:01-CV-0001-TWT [Doc. 38], Ex. Y, Cochran Dep. at 200, 202-03, 316-21; Ex. BB, Fine Dep. at 43-44, 46-48, 50; Ex. AA, Price Dep. at 77-78; Ex. Z, Perlman Dep. at 129-33). There is a lack of evidence that MM & M had actual *1362 knowledge of the risks involved in the change in business model, therefore, MM & M's failure to mention this event in their Opinion Letter does not constitute an actionable omission. The CDL Plaintiffs' motion is denied and the Defendant's motion is granted as to the federal securities law claims.

2. STATE BLUE SKY LAWS

(A) LIABILITY UNDER THE BLUE SKY LAWS
Although each of the Plaintiffs' respective Agreement and Plan of Merger documents call for the applicability of Georgia law to the transaction, the terms of the contract do not limit the applicability of state "Blue Sky" investor protection acts. In the case of Barnebey v. E.F. Hutton, 715 F.Supp. 1512 (M.D.Fla.1989), the Middle District of Florida held that a single transaction can give rise to a violation of several states' securities anti-fraud acts. Citing Lintz v. Carey Manor, Ltd., 613 F.Supp. 543 (W.D.Va.1985), the Barnebey court wrote:
If upon application of the facts a transaction is found to be covered by the statutory scheme developed by [other] states, then the penalties can be applied. [The Court sees] no reason why a conflicts of law problem develops if one Blue Sky law provides fewer remedies, lacks an attorney's fee provision, has a shorter statute of limitations or has a more limited scope that the law of another state. Just as the same act can violate both federal and state statutes as well as state common law, so too can it violate several Blue Sky laws simultaneously. There is nothing inconsistent in trying a securities case on multiple theories, and determining liability under each statute that is applicable, so long as the plaintiff is prevented from multiple recoveries ... When a securities transaction crosses state lines and the plaintiffs sue under a blue sky law ... more than one state's blue sky law may apply.
Barnebey, 715 F.Supp. at 1534-36 (citations omitted). In Alberts v. Davis, et al., slip op., N.D. Ga., No. C75-2483A, (Edenfield, J., 1978), 1978 U.S. Dist. LEXIS 15207, when confronted with this question, Judge Edenfield of this Court stated:
Furthermore, the contract clause purporting to choose Georgia law to govern the relationship between the parties has no effect on the application of securities statutes, as such statutes are intended to protect the investor and it has been found to be against public policy to permit the use of choice of law clauses to circumvent this legislatively created shield.
Id. at *19 (citations omitted). Accord, Garland v. Advanced Medical Fund, L.P., II, 86 F.Supp.2d 1195 (N.D.Ga.2000).
Although each of the closings were physically held in MM & M's offices in Atlanta, Georgia, these transactions involve citizens of multiple states. The CDL Plaintiffs never actually attended a physical closing, but instead faxed executed signature pages to MM & M's office from their homes in Florida. (Pla.'s Motion, Ex. Jj, Weiner Dep. at 95.) Memminger physically attended his closing, but his attorney reviewed documents by fax in Detroit, Michigan. (Pla.'s Motion, Ex. Kk, Memminger Dep. at 118-19.) And while Runde was physically present for the signature of the documents in the Medfax transaction, Habermeier and Weintraub were not present. (Pla.'s Motion, Ex. Ll, Runde Dep. at 71-72.)

(B) SOUTH CAROLINA BLUE SKY LAW
Plaintiffs Runde and Habermeier are both residents of South Carolina, and Medfax Corporation was a South Carolina company. (Pla.'s Motion, Ex. Ll, Runde Dep. *1363 at 7-8; Ex. Nn, Habermeier Dep. at 4.) While Runde was present at the Medfax closing in Georgia, Habermeier, like Weintraub, faxed his executed documents to MM & M's offices on the day of the closing. (Pla.'s Motion, Ex. Ll, Runde Dep. at 71-72.) The portions of the South Carolina Uniform Securities Act at issue in this case are codified at S.C.Code Ann. §§ 35-1-1490 and 1500. Section § 1490 provides:
Any person who:
* * *
(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission; [i]s liable to the person buying the security from him ...
S.C.Code Ann. § 35-1-1490. Section 35-1-1500 of the code provides that:
Every person who directly or indirectly controls a seller liable under Section 35-1-1490, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.
S.C.Code Ann. § 35-1-1500. Due to Section 1490's similarity to Section 12 of the federal Securities Act of 1933, the South Carolina courts have adopted the Supreme Court's analysis of Pinter v. Dahl, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The Supreme Court in Pinter held that being a substantial factor in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under Section 12(1). The Court held that "[t]here is no support in the statutory language or legislative history for expansion of [Section] 12(1) primary liability beyond persons who pass title and persons who `offer,' including those who `solicit' offers." Pinter, 486 U.S. at 650, 108 S.Ct. 2063.
The South Carolina Uniform Securities Act defines "offer to sell" as including "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." S.C.Code Ann. § 35-1-20(13)(b). A "`sale' or `sell' includes every contract or sale of, contract to sell, or disposition of, a security or interest in a security for value." S.C.Code Ann. § 35-1-20(10)(a). The South Carolina Supreme Court, in Biales v. Young, 315 S.C. 166, 432 S.E.2d 482, 485 (1993), held that a seller's attorney does not become a "seller" merely by speaking directly with a buyer to assure the buyer of certain facts relevant to the transaction. Biales, 432 S.E.2d at 485. Accordingly, "[t]o be a `person who offers or sells a security' under § 35-1-1490 a nonowner must (1) solicit the purchase and (2) be motivated at least in part by a desire to serve his own financial interest or that of the owner of the security." CFT Seaside Inv. L.P. v. Hammet, 868 F.Supp. 836, 842 (D.S.C.1994). In this case, MM & M did not sell or offer to sell Infocure's stock to *1364 the Medfax Plaintiffs. Although it may have prepared certain documents and even provided an opinion as to facts relevant to the transaction, settled law shows that these acts are insufficient to create liability under Section 1490. To hold otherwise would impose possible liability for every professional in a transactional setting. CFT Seaside, 868 F.Supp. at 843.
Similarly, MM & M deserves summary judgment under Section 1500. Under this provision, MM & M must be deemed to have been an "employee" or "agent" of Infocure for liability to be imposed. The South Carolina case of Allen v. Columbia Fin. Mgmt., 297 S.C. 481, 377 S.E.2d 352 (1988) sets forth the criteria to determine whether an attorney is an "employee" of a seller for purposes of § 1500. The court in Allen held that the "principal factor that makes one an employee, or servant, rather than an independent contractor is the right of the employer, or master, to control and direct the particular work or undertaking as to the means or manner of its accomplishment." Allen, 377 S.E.2d at 356-57. As in Allen and CFT Seaside, there is no evidence of record here to indicate that MM & M was subject to such control by Infocure so as to qualify as employees under Section 1500. Id. at 357; CFT Seaside, 868 F.Supp. at 843. As to the agency argument, the South Carolina Uniform Securities Act provides its own definition for the term "agent" as:
[A]ny individual, other than a broker-dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities ... A partner, officer or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent if he or she is within this definition.
S.C.Code Ann. § 35-1-20(2). The district court in CFT Seaside held that this definition does not cover professionals such as attorneys engaged in their traditional advisory functions. CFT Seaside, 868 F.Supp. at 844. The definition, instead, "covers persons who assist directly in offering securities for sale, soliciting offers to buy, or performing the sale, but who do not fit the definition of broker-dealer." Id. Nothing in the record here suggests that MM & M stepped outside the bounds of attorneys in a run-of-the-mill merger transaction. It is clear to me that MM & M is not subject to liability under the provisions of Section 1500. The Plaintiffs' request for summary judgment is denied as to the South Carolina Uniform Securities Act, and the Defendant's motion is granted.

(C) NORTH CAROLINA BLUE SKY LAW
Plaintiff Weintraub, one of the Medfax Plaintiffs, is a resident of North Carolina. (Pla.'s Motion, Ex. Mn, Weintraub Dep. at 114.) Dr. Weintraub did not physically attend the Medfax closing, but instead executed the papers and faxed them to MM & M's offices in Atlanta, Georgia. (Pla.'s Motion, Ex. Ll, Runde Dep. at 71-72). The portion of North Carolina's Blue Sky law which provides a private right of action is similarly modeled after Section 12(a) of the federal Securities Act of 1933. The North Carolina statute provides:
(a) Any person who:
* * *
(2) Offers or sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading .... is liable to the person purchasing the security from him ...
N.C. Gen.Stat. § 78A 56(a)(2). The statute continues:

*1365 (c) Every person who directly or indirectly controls a person liable under subsection (a) or (b), every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction, and every dealer or salesman who materially aids in the sale are also liable jointly and severally with and to the same extent as such person ...
N.C. Gen.Stat. § 78A-56(c). Because this statute also closely resembles Section 12 of the 1933 Securities Act, MM & M is not liable under its provisions for the same reasons that the South Carolina statute does not impose liability. The Plaintiffs' Motion for Summary Judgment as to the North Carolina securities statute is denied and the Defendant's is granted.

(D) MICHIGAN BLUE SKY LAW
The Memminger transaction involved the acquisition of a Michigan corporation, and Memminger is a Michigan resident. Memminger's attorney did not physically attend the closing, but represented his client via telephone and fax. (Pla.'s Motion, Ex. Kk, Memminger Dep. at 118-19.) Like South Carolina and North Carolina, the Michigan Uniform Security Act ("MUSA"), mirrors Section 12(a) of the Federal Securities Act of 1933, and provides for a private civil remedy, for damages and interest, including attorney's fees and costs, against any person who:
Offers or sells a security or commodity contract by means of any untrue statement or a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.
Mich. Comp. Laws § 451.810(a)(2). Citing the case of Yadlosky v. Grant Thornton, LLP, 120 F.Supp.2d 622 (E.D.Mi.2000), Defendants argue that there is no private right of action under the Michigan securities laws. Id. at 633. The provision of the MUSA relied upon by Yadlosky is Section 451.801(h). This provision states that "[t]he rights and remedies provided by this act are in addition to any other rights or remedies that may exist at law or in equity, but this act does not create any cause of action not specified in this section." Mich. Comp. Laws § 451.801(h). The problem with Defendants' argument is that while Section 451.801(h) prohibits private causes of actions not specified, the cause of action Plaintiffs bring is clearly specified in Section 451.801(a) as set forth above. Section 451.801 specifically anticipates a private cause of action by the buyer of securities against the seller when material misrepresentations or omissions are used to induce purchase.
The Michigan, South Carolina and North Carolina statutes are identical for all practical purposes. Section 451.801 clearly applies only to those who sell or offer to sell securities. Michigan courts have acknowledged interpretation of the federal statute offers valuable guidance as to the interpretation of the state statute. Kirkland v. E.F. Hutton and Co., 564 F.Supp. 427, 444 (D.Mich.1983). Additionally, the definitions of "sale" and "offer" are identical under the MUSA as under the South Carolina Act. See, Mich. Comp. Laws § 451.801(v)(1)-(2). MM & M's activities during the Memminger transaction, as with Medfax, do not qualify as the sale or offer to sell of securities. MM & M may not be held liable under Section 451.810(a)(2).
*1366 The Michigan statute goes on to state that:
Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is no contribution as in cases of contract among the several persons so liable.
Mich. Comp. Laws § 451.810(b). In Kirkland, the court denied a broker's motion to dismiss the plaintiff's Section 451.810 claim because the statute clearly allows liability for brokers and other persons besides sellers. Kirkland, 564 F.Supp. at 445. However, it is my opinion that attorneys for the seller, who perform duties within the normal ambit of transactional professionals, may not be held liable as an "employee" or "agent" of the seller who materially aided in the sale of securities. Memminger's Motion for Summary Judgment as to the Michigan Uniform Securities Act is denied, and MM & M's motion is granted.

(E) GEORGIA BLUE SKY LAW
Given that Infocure and MM & M are each headquartered in Georgia, and that substantial portions of the transactions at issue transpired there, the Georgia Investor Protection Act, O.C.G.A § 10-5-12(a)(2), is applicable to these transactions. The Georgia Act is similar to Rule 10b-5, and requires the same elements of proof. Pelletier v. Zweifel, 921 F.2d 1465, 1511 (11th Cir.1991) (citing Kirk v. First Nat'l Bank, 439 F.Supp. 1141, 1147-48 (M.D.Ga. 1977)); Curtis v. State, 99 Ga.App. 732, 735, 109 S.E.2d 868 (1959). As such, the Court's conclusions set forth above that MM & M's Opinion Letter did not contain false misrepresentations or omissions, works to defeat the Plaintiffs' claim under the Georgia statute. Therefore, Plaintiffs' motion is denied and Defendant's motion is granted as to these claims.

(F) FLORIDA BLUE SKY LAW
The CDL Plaintiffs each reside in, and closed the transaction by fax from, the state of Florida. Plaintiffs have sued MM & M for violations of Florida's Blue Sky Law. This statute provides:
(1) It is unlawful and a violation of the provisions of this chapter for a person: (a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security ... directly or indirectly: 1. To employ any device, scheme, or artifice to defraud; 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.
Fl. Stat. Ann. § 517.301 (West 1997). Plaintiffs allege MM & M is liable under Section 517.211(2) which states:
Any person in purchasing or selling a security in violation of § 517.301, and every director, officer, partner or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly or severally liable to the person selling the *1367 security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.
Fl. Stat. Ann. § 517.211(2) (West 1997). Florida adopts the approach previously discussed, holding that the Supreme Court's reasoning in Pinter v. Dahl controls to prohibit the imposition of liability on attorneys carrying out normal transactional duties during the sale of covered securities. Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A., 938 F.Supp. 825, 828-29 (S.D.Fl. 1996); In re Sahlen & Assocs., Inc. Securities Litigation, 773 F.Supp. 342, 372 (S.D.Fla.1991). For the same reasons as set out above then, this Court holds that MM & M may not be held liable under Florida's securities fraud statute.

3. STATE LAW CLAIMS

(A) BREACH OF CONTRACT
Plaintiffs also seek to hold MM & M liable for breach of contract. "It has long been the law of this state that a cause of action for legal malpractice alleging negligence or unskillfulness sounds in contract (agency)." Plumlee v. Davis, 221 Ga.App. 848, 473 S.E.2d 510 (1996) (quoting Hamilton v. Powell, Goldstein, Frazer & Murphy, 167 Ga.App. 411, 412, 306 S.E.2d 340 (1983)). The parties agree that the contract which Plaintiffs claim MM & M has breached is one for the performance of professional services, and, therefore, a claim for breach of such contract must satisfy the elements of a legal malpractice claim. The elements of such a claim are: (1) an attorney-client relationship; (2) failure of the attorney to exercise ordinary care, skill and diligence; and (3) damages proximately caused by that failure. Tante v. Herring, 264 Ga. 694, 453 S.E.2d 686 (1994). As explained in Horn v. Smith & Meroney, 194 Ga.App. 298, 390 S.E.2d 272 (1990):
The relationship of attorney-client may be expressly created by written contract, or may be inferred from the conduct of the parties. Although generally, the test of employment is the fee, the basic question with regard to the formation of the attorney-client relationship is whether it has been sufficiently established that advice or assistance of the attorney is both sought and received in matters pertinent to the profession.
Id. at 298-99, 390 S.E.2d 272 (citing Huddleston v. State, 259 Ga. 45, 46-7, 376 S.E.2d 683 (1989)). One who cannot establish such a relationship is said not to be in contractual privity with the attorney, and cannot maintain a professional malpractice action against him. Id. It is clear to me that Plaintiffs have failed to establish an attorney-client relationship with MM & M. An attorney-client relationship can only be created where there is an objective manifestation of mutual intent and cannot be created unilaterally in the mind of the would-be client. Newberry v. Cotton States Mutual Ins. Co., 242 Ga.App. 784, 785, 531 S.E.2d 362 (2000); Guillebeau v. Jenkins, 182 Ga.App. 225, 230-31, 355 S.E.2d 453 (1987). No such relationship developed between the Plaintiffs and MM & M, either expressly or implicitly. The Plaintiffs' claims for breach of contract fail as a matter of law for this reason.
It now appears to be undisputed that there was no express contract between MM & M and any of the Plaintiffs. This is supported by the Plaintiffs' own testimony that MM & M was representing Infocure and not them. Robert Runde testified as follows:
Q: Now, in the period up to the closing, you were represented by Robinson Bradshaw; correct, sir?
A: That's correct.
Q: And they were your lawyers after the closing as well; correct?

*1368 A: They were my attorneys, yes.
Q: Morris Manning was never your attorney before or after the closing; correct?
A: My understanding was they were the attorney for Infocure.
(Def.'s Motion, Ex. Q, Runde Dep. at 217.) Medfax Plaintiff Hans Habermeier testified:
Q: You never thought that Morris Manning was representing you, did you?
MR. WILSON: Object to form
THE WITNESS: Well, they were representing us, you know, Medfax.
Q: (By Ms. Mast) Morris Manning was representing Medfax?
A: Morris Manning is the lawyer in Charlotte, right?
Q: (By Ms. Mast) No. That's Robinson Bradshaw.
A: Robinson Bradshaw. Morris Manning? No, I don't know. I don't think so.
Q: You understood that Morris Manning was the law firm representing Infocure?
MR. WILSON: Object to form.
THE WITNESS: See what I mean?
Q: (By Ms. Mast) That's okay. Is that an accurate statement?
A: There's so many law firms. Yeah-no, I don't think they were representing me.
Q: Okay. You understand that they were actually representing Infocure?
MR. Wilson: Object to form.
THE WITNESS: Yeah. I have to assume that, yeah.
Q: (By Ms. Mast) You don't know any different?
A: (Shakes had negatively.)
(Def.'s Motion, Ex. XX, Habermeier Dep. at 116-117.) Medfax Plaintiff Richard Weintraub testified:
Q: Now, before the closing you had the opportunity to discuss these with your lawyers at Robinson Bradshaw; did you not?
A: Yes
Q: But you did not do so?
A: Correct.
Q: Now, Robinson Bradshaw was your attorney at that time?
A: They were our corporate attorney for Medfax.
Q: And they were acting as your attorney as well; were they not?
A: Correct.
Q: And Morris Manning was not your attorney; was it?
A: Correct.
(Def.'s Motion, Ex. WW, Weintraub Dep. at 95-96.)
Similarly, Plaintiff Hafner consistently testified in his deposition that he had his own separate counsel representing him both in the transaction and regarding the registration of his shares. (Def.'s Motion 1:00-CV-3123-TWT [Doc. 66], Ex. E, Hafner Dep. at 232.) Hafner testified regarding the transaction that Frank & Rosen, not MM & M represented him. (Def.'s Motion 1:00-CVV-3123-TWT [Doc. 66], Ex. E, Hafner Dep. at 179.) Memminger also testified to his understanding that MM & M served only as Infocure's attorney. (Def.'s Motion 1:00-CV-3247-TWT [Doc. 93], Ex. Q, Memminger Dep. at 227-28.) Memminger's attorney provided similar testimony. (Def.'s Motion 1:00-CV-3247-TWT [Doc. 93], Ex. R, Hudson Dep. at 92.)
Medfax Plaintiff Robert Runde affirmed that in the post closing period, when MM & M is alleged to have breached a contract with the Plaintiffs, MM & M was working on behalf of Infocure. Robinson Bradshaw continued to represent the Medfax Plaintiffs:
Q: Now, in the period after September 21 through the end of the year, did you *1369 personally have any contact with Morris Manning lawyers where the only participants in the contact were you and one or more Morris Manning lawyers.
A: I believe there was probably some correspondence in that time frame, but as far as a telephone conversation or a meeting with just them, I can't recall one, no.
Q: What correspondence do you recall?
A: I mean, the registration of the shares that did take place I believe Morris Manning handled that and sending me the-I don't know if they sent me the certificate or not, but they seemed to be handling everything to do with the shares, so I assumed it would have been with them.
Q: And they were acting for Infocure in connection with that?
A: Oh, my understanding was that was-they were the-I don't know if the proper term is agent or not, but they were representing Infocure in the handling of the shares.
(Def.'s Motion, Ex. Q, Runde Dep. at 218-19.) Runde further testified:
Q: Throughout this period of January 1, 2000, through the beginning of May 2000, were you paying for the services of Robinson Bradshaw?
A: Yes.
Q: And in the period of September 1 through December 31, 1999, you were paying for the services of Robinson Bradshaw as well; correct?
A: That is correct.
(Def.'s Motion, Ex. Q, Runde Dep. at 221.)
Medfax Corporation's attorneys also testified that they represented the company and the individual plaintiffs, and that MM & M represented Infocure:
Q: What was your understanding of the role of Morris, Manning & Martin in the Medfax transaction?
A: They were counsel for Infocure.
Q: And your firm was counsel for Medfax?
A: Yes.
Q: Was your firm also counsel for the individual shareholders of Medfax?
A: Yes.
(Def.'s Motion, Ex. R, Buck Dep. at 33.) Mr. Buck further testified that MM & M's post-closing role regarding registration of the Plaintiffs' stock was to represent Infocure in connection with registration issues. (Def.'s Motion, Ex. R, Buck Dep. at 98-99.) Similar testimony was offered with respect to Plaintiffs Hafner and Memminger. (Def.'s Motion 1:00-CV-3123-TWT [Doc. 66], Ex. E, Hafner Dep. at 180; Def.'s Motion 1:00-CV-3247-TWT [Doc. 93] Ex. R, Hudson Dep. at 92.) In light of this undisputed testimony, it is clear to me that no express contract existed between MM & M and the Medfax Plaintiffs for the rendering of any legal services.
It is also my opinion that no implied contract between MM & M and the Plaintiffs existed. In order to show that an implied contract existed between the Plaintiffs and MM & M, the Plaintiffs must show that the parties mutually intended to enter into such a contract. Guillebeau, 182 Ga.App. at 230-31, 355 S.E.2d 453. It is well-settled that Georgia does not recognize an implied attorney-client relationship where the person asserting the relationship never paid the lawyer any fees, was represented by his own counsel, and never informed the attorney that he was relying on him for legal advice. As explained in Horn, where the Georgia Court of Appeals upheld the dismissal of a claim similar to that asserted by the Plaintiffs:
[Appellants] never paid any legal fees to appellees and never sought any legal advice from them. Likewise, appellants never informed appellees that they were relying upon them for legal advice, and they have always understood that appellees *1370 were the legal representatives of their son's widow. Except for one brief period of time, appellants have been represented by counsel of their own choosing in connection with their legal rights as surviving parents of their deceased son.
Horn, 194 Ga.App. at 299, 390 S.E.2d 272. Accord, Driebe v. Cox, 203 Ga.App. 8, 9, 416 S.E.2d 314 (1992) (a party with his own lawyer representing him in a transaction may not choose to limit his attorney's role and then rely on the attorney for the other party in that transaction).
The same is true here. The Plaintiffs had their own attorneys representing them who have testified that they understood MM & M to be representing Infocure, not the Plaintiffs. (Def.'s Motion, Ex. R, Buck Dep. at 33, 98-99; Def.'s Motion, 1:00-CV-3123-TWT [Doc. 66], Ex. E, Hafner Dep. at 180; Def.'s Motion 1:00-CV-3247-TWT [Doc. 93], Ex. R, Hudson Dep. at 92.) The Plaintiffs never paid MM & M any fees, and never told MM & M they were looking to it as their attorney. For example, Plaintiff Runde testified that he had not ever written MM & M and informed it that he was going to hold it responsible for Infocure's failure to register his stock. (Def.'s Motion, Ex. Q, Runde Dep. at 223.) Moreover, the documents into which the Plaintiffs entered into made it clear to Infocure and MM & M that each of the Plaintiffs' attorneys, not MM & M, was going to be the Plaintiffs' counsel in connection with the registration of their Infocure stock. For instance, the Registration Rights Agreement provides that Robinson, Bradshaw & Hinson will continue as the Medfax Plaintiffs' lawyer with regard to "all notices given in connection with this Agreement." (Def.'s Motion, Ex. BBB, Registration Rights Agreement at 11, ¶ 13.5.) The same is true as to Frank & Rosen in the Hafner/Glentec transaction. (Def.'s Motion 1:00D-CV-3123-TWT [Doc. 66], Ex. D, Registration Rights Agreement at 11.) Finally, both MM & M attorneys Bradley Pruitt and Duncan Spears, who dealt with the Plaintiffs as to the registration of their stock, state unequivocally that they made no promise or promissory undertaking, to any of the Plaintiffs on that, or any other matter. (Def.'s Motion, Ex. EEE, Pruitt Dep. at 146-47; Ex. FFF, Spears Dep. at 192-93.) The undisputed evidence in the record leads to the conclusion that there was no mutual intent to form a contract between MM & M.
Plaintiffs also cannot maintain a claim under the voluntary agency theory. Georgia has adopted Section 378 of The Restatement of Agency 2d regarding this theory of recovery in legal malpractice cases. Moore v. Harris, 188 Ga.App. 251, 253, 372 S.E.2d 654 (1988). Section 378 of The Restatement of Agency 2d provides:
One who, by gratuitous promise of other conduct which he should realize will cause another reasonably to rely upon the performance of definite acts of service by him as the other's agent, causes the other to refrain from having such acts done by other available means is subject to a duty to use care to perform such service, or while other means are available, to give notice that he will not perform. A key element of the voluntary agency theory is that the attorney act, knowing that the plaintiff was relying on him in his professional capacity.
Restatement (Second) of Agency § 378 (1958). Under Section 378, the voluntary agency theory is available only where a professional specifically undertook to perform a service on behalf of a non-client and induced the individual reasonably to rely on that specific promise to perform the service. Moore, 188 Ga.App. at 253, 372 S.E.2d 654. Any claim by Plaintiffs under this theory fails as a matter of law because: (1) there was no gratuitous promise by MM & M because any promise was *1371 undertaken in connection with its representation of and for the benefit of Infocure; and (2) Plaintiffs specifically contracted for Infocure to register their stock, and did not forego any other options to have the stock registered based on representations of MM & M.
Moore makes it clear that, where an individual is represented by his own attorney in a transaction, and acknowledges that fact in the transaction documents, he cannot maintain an action against the other party's attorney under the voluntary agency theory. Moore, 188 Ga.App. at 253, 372 S.E.2d 654. In Moore, the attorney informed all the parties that he was representing the interests of only the seller and the plaintiff responded that he had a lawyer in another state to consult. Id. Also, in the stock purchase contract itself, the plaintiff, who represented the buyers as a group, acknowledged that the attorney had not acted as the plaintiffs' attorney and that the plaintiffs had not received or relied upon any tax advice allegedly given by the attorney or his firm. Id. As previously shown, Plaintiffs acknowledge that they were represented by their own attorneys in connection with the transaction. Plaintiffs also expressly so represented and warranted in the Subscription Agreements that they signed. (Def.'s Motion 1:00 CV 3247 TWT [Doc. 93], Ex. J, Memminger's Subscription Agreement; Def.'s Motion 1:00 CV 3123 TWT [Doc. 66], Ex. O, Hafner's Subscription Agreement.) The Plaintiffs testified also that their attorneys continued to represent them after the closing. This is further demonstrated in the Registration Rights Agreement executed by Plaintiffs that provides their individual attorneys would continue as the Plaintiffs' lawyers on all matters "in connection with" the registration of the Plaintiffs' stock with regard to "all notices, requests, demands, and other communications under this Agreement." (Def.'s Motion 1:00-CV-3247-TWT [Doc. 93], Ex. WW, Memminger's Registration Rights Agreement at ¶ 13.5; Def.'s Motion 1:00-CV-3123-TWT [Doc. 66], Ex. D, Hafner's Registration Rights Agreement at ¶ 13.5.)
In addition to requiring that the Plaintiffs prove that they relied on MM & M, as opposed to Infocure, to file the registration statement for his shares, the voluntary agency theory applies only where the supposed agent "causes the other to refrain from having such acts done by other available means." Restatement (Second) of Agency, § 378 (1958); see also Nelson v. Union Wire Rope Corp., 31 Ill.2d 69, 199 N.E.2d 769, 780 (1964) (Section 378 does not apply where the plaintiff did not rely on the defendant). Plaintiffs cannot prevail as a matter of law under the voluntary agency theory because no representations made by MM & M could have caused them to forego other alternative means to have their stock registered. Rather, they specifically contracted in the Registration Rights Agreement for Infocure to register their stock. Indeed, Plaintiffs entered into the Registration Rights Agreement with Infocure after they contend that MM & M represented to them that it would register their stock. Plaintiffs voluntarily entered into an agreement where the registration of their stock was under the control of Infocure. Thus, nothing MM & M might have told Plaintiffs caused them to forego other available means to register their stock; to the contrary, they contracted for Infocure to register the stock.
The Plaintiffs claim, as a final alternative theory of recovery, that they are third-party beneficiaries of the attorney-client relationship between Infocure and MM & M. This claim also fails because the Plaintiffs were not intended beneficiaries and the benefits of which they claim originated in their contract with Infocure, not *1372 in the alleged contract between MM & M and Infocure. Georgia has been reluctant to recognize the third-party beneficiary theory and has imposed the requirement that it must clearly appear from the contract itself that both contracting parties intended to benefit the third party. Florida Int'l Indemnity Co. v. City of Metter, 952 F.2d 1297, 1300 n. 10 (11th Cir.1992); Kaiser Aluminum & Chemical Corp. v. Ingersoll-Rand Co., 519 F.Supp. 60, 72 (S.D.Ga.1981) (citing Backus v. Chilivis, 236 Ga. 500, 502, 224 S.E.2d 370 (1976)). Further as explained in Collins v. Int'l Dairy Queen, Inc., 2 F.Supp.2d 1465 (N.D.Ga.1998), "third parties may sue on the contract only if the contract was intended for their direct benefit rather than merely their incidental benefit." Id. at 1469. "Beneficiaries of contracts may not seek to enforce contracts from which they were not specifically intended to benefit." City of Metter, 952 F.2d at 1299-1300.
MM & M's attorney-client relationship with Infocure is the contract under which the Plaintiffs claim to have been beneficiaries. But the Plaintiffs were not third-party beneficiaries under it since both parties to the contract did not intend that they be beneficiaries. Even if Infocure intended the Plaintiffs to be beneficiaries of MM & M's legal representation of Infocure, there is no evidence that MM & M intended or accepted that responsibility. Indeed the MM & M witnesses expressly deny that they did so. (Def.'s motion, Ex. EEE, Pruitt Dep. at 146-47; Ex. FFF, Spears Dep. at 192-93; Ex. U, Burnham Dep. at 477-78.) Any steps taken by MM & M to prepare and file a registration statement covering the Plaintiffs' stock were undertaken on behalf of Infocure, MM & M's client. Such acts were done for the benefit of the client and do not reflect any specific intent on the part of MM & M to benefit the Plaintiffs. To the extent that MM & M attorneys made offhand remarks at the closings about taking care of the registrations, these remarks were intended to benefit Infocure by inducing the Plaintiffs to go forward with the closings of the transactions. They were not intended to benefit Plaintiffs.
Georgia further requires that a plaintiff suing under a third-party beneficiary theory be "in a limited class of persons known to be relying upon representations" of the attorney. Kirby v. Chester, 174 Ga.App. 881, 884-85, 331 S.E.2d 915 (1985). For example, in Kirby, the court held that an attorney could be liable to a non-client for negligence in certifying title for a loan on behalf of another party (the lawyer's client) who was attempting to borrow money from the non-client. Id. at 885-86, 331 S.E.2d 915. The attorney certified the title of his client's property to Kirby, the lender. Id. The obvious purpose of the attorney certifying title was to let the non-client know that he was getting good collateral for the loan. Id. at 885, 331 S.E.2d 915. Thus, in Kirby, both attorney and client intended for the services provided by the attorney to benefit the third party. The Plaintiffs' situation is different. The Plaintiffs specifically contracted for Infocure to file a registration statement for their shares. Any action taken by MM & M to do so was done on behalf of Infocure, not on behalf of the Plaintiffs. MM & M acted only at the direction of its client, Infocure. It was impossible for MM & M to file any registration statement independently without the direction of its client, Infocure.
No claim as a third-party beneficiary lies where the benefit conferred on the plaintiff "did not originate on the contract on which [he] sued, but rather originated on another contract." McWhirter Material Handling Co., Inc. v. Georgia Paper Stock Co., 118 Ga.App. 582, 582, 164 S.E.2d 852 (1968); Malta Construction v. Henningson, Durham & Richardson, 694 *1373 F.Supp. 902, 908 n. 10 (N.D.Ga.1988), aff'd 927 F.2d 614 (11th Cir.1991). A person cannot claim a right under a contract to which he is not a party where he has specifically negotiated for the same right as a party in a separate contract. Infocure's breach of the Plaintiffs' Registration Rights Agreement is the cause of Plaintiffs' loss. MM & M's Motion for Summary Judgment as to Plaintiffs' state law breach of contract claims is granted.

(B). COMMON LAW FRAUD
In Count V of their Amended Complaint, the CDL Plaintiffs assert a claim for common law fraud. "Under Georgia law, a plaintiff suing for recovery for fraudulent misrepresentations must prove five essential elements: (1) the defendant made representations; (2) knowing they were false; (3) intentionally and for the purpose of deceiving the plaintiff; (4) which the plaintiff reasonably relied on; (5) with the proximate result that the plaintiff incurred damages." Williams v. Dresser Industries, Inc., 120 F.3d 1163, 1167 (11th Cir.1997). An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts. Id. For the reasons set forth above in the discussion of Plaintiffs' securities law claims, the Plaintiffs have failed to show that MM & M made false misrepresentations or failed to disclose what it had a duty to Plaintiffs to disclose. Therefore, MM & M is entitled to summary judgment with respect to the Plaintiffs' common law fraud claims.

IV. CONCLUSION
For the reasons set forth above, in the case of In Re Infocure Securities Litigation, No. 1:01-CV-840-TWT, Plaintiffs' Motion for Partial Summary Judgment [Doc. 93] is DENIED and Defendant Morris, Manning & Martin's Motion for Summary Judgment [Doc. 113] is GRANTED. The Court also rules on Defendant Morris, Manning & Martin's duplicate motions filed in the individual cases as follows: Hafner v. Infocure Corp., No. 1:00-CV-3123-TWT, [Doc.66] is GRANTED; Habermeier v. Infocure Corp., No. 1:00-CV-3442-TWT, [Doc. 40] is GRANTED; Memminger v. Infocure Corp., No. 1:00-CV-3247-TWT, [Doc. 93] is GRANTED; Runde v. Infocure Corp., No. 1:00-CV-3441-TWT, [Doc. 42] is GRANTED; Weintraub v. Infocure Corp., No. 1:00-CV-3440-TWT, [Doc. 41] is GRANTED; Weiner, et al., v. Infocure Corp., No. 1:01-CV-0001, [Doc. 38] is GRANTED. The Clerk is directed to enter a final judgment in favor of the Defendant Morris, Manning & Martin in each of these cases.
NOTES
[1] For ease of reference, the Plaintiffs have continued the exhibit lettering format from their previous Motion for Summary Judgment [Doc. 35], filed on Aug. 31, 2001, which this Court denied in light of a pending settlement between Infocure and Plaintiffs. All references to Plaintiffs' Exhibits "A" through "LLL" refer to Vols. I and II filed with the earlier motion. References to Exhibits "MMM" and forward refer to Vol. III filed with the pending Motion for Partial Summary Judgment [Doc. 93].
[2] Unless otherwise stated, any reference to "Def.'s Motion" is to the motion filed by MM & M in the consolidated case, 1:01-CV-840-TWT, at Doc. 113.